## NEW YORK PHONOGRAPH CO. v. EDISON et al.

(Circuit Court, S. D. New York, January 5, 1905.    On Rehearing, April 20, 1905.)

1. PATENTS—LICENSES TO SELL AND USE—TRANSFER OF PATENT—DEFECT.

Where a corporation owning patents, subject to licenses granted to sell and use, became insolvent, and its assets were purchased at a receiver's sale by E., who had full knowledge of the rights of the licensee, and he thereafter organized another corporation, to which he conveyed the assets of the former company so purchased, excepting the rights of the insolvent under the licenses, which he transferred to a trusted employé, the succeeding corporation, taking with full knowledge of the licenses, was bound thereby.

2. SAME—INVASION OF LICENSE—EQUITABLE RELIEF.

Where complainant acquired the exclusive right to use, exhibit, and sell phonographs and graphophones, under a license from a corporation owning patents thereon, and such rights were wrongfully invaded by a subsequent corporation, which succeeded to the rights of the licensor with knowledge of the licensee, complainant was entitled to recover against the latter in equity for breach of covenant.

3. SAME—LACHES.

Where complainant, a licensee of the exclusive right to use and sell patented phonographs and graphophones in a certain district, brought suit against defendant, a corporation which succeeded to the rights of the licensor, for breach of covenant in the license within five years after defendant's incorporation, and within less than three years after the termination of fruitless negotiations to settle, and there was no evidence that complainant had acquiesced in defendant's intrusion into such field, complainant was not barred by laches.

4. SAME—BREACH OF COVENANT—FORFEITURE.

A breach of covenant contained in an exclusive license to use and sell patented phonographs and graphophones in a specified territory did not work a forfeiture of the license per se, no condition to that effect being inserted in the license.

5. SAME—ABANDONMENT—INSOLVENCY.

Where an exclusive license, within specified territory, to use and sell patented phonographs and graphophones, authorized the licensor, on written notice, to immediately terminate all the rights granted, on the licensee's failure to perform certain conditions, and in the event of the licensee becoming bankrupt or insolvent, the licensee's insolvency did not operate as an abandonment of its contract rights, in the absence of notice, it being willing and capable of fulfilling its contract obligations notwithstanding such insolvency.

6. SAME—EXTENSION.

Certain licenses for the exclusive use and sale of patented phonographs and graphophones in a limited territory provided that the licenses should be extended on performance of a covenant that the licensee, at or before the expiration of the original term, would increase its capital stock to a specified amount and deposit the same with a trust company for delivery to the licensor or a trustee, and on notice of such deposit the licensor would forthwith deposit with the trust company, for delivery, extension licenses specified. Extension licenses were duly executed and delivered to the trust company thereunder, and stock deposits made and accepted by the trust company, but after the delivery of the stock and extension licenses to the latter it was directed not to deliver the stock certificates pending settlement of certain claims of the licensee against the stock. Held, that the extension licenses were effective on the deposit of the stock with the trust company, the subsequent notice not to deliver the stock being ineffective.

On Rehearing.

**7. PATENTS—LICENSES—EXTENSION OF TERM.**

An extension of the term of a patent does not inure to the transferee of a license, in the absence of language expressing such intention.

**8. SAME—LICENSES—SUBSEQUENT EXTENSION.**

Where an assignment of certain patents contained agreements whereby all inventions or improvements on the patented article made by the patentee within 15 years should be assigned, and improvements were made and patented in several years subsequent to the execution of a license to use and sell, providing for a second extension for such further time as the "assignee was authorized to extend such license," subject to the covenants and agreements of the original contract, the licensee was not entitled to a second extension in perpetuity, but only until the expiration of the last improvement patents.

**9. SAME—OPTION TO RENEW—CONSTRUCTION.**

Where an exclusive license to use and sell patented phonographs and graphophones provided for a second extension for such further time, "at the option" of the licensee, as the licensor may be authorized to extend the license, and it appeared that the agreement was regarded by both parties to contemplate continuous business relations between them, the option was, in effect, but a reservation of the right to the licensee to discontinue existing relations, and its exercise was not, therefore, a condition precedent to the licensee's right to a renewal.

**10. SAME—NOTICE—WAIVER.**

A license to use patented phonographs and graphophones provided for a renewal until March 26, 1903, and for a second renewal after such date for "such further time, at the option" of the licensee, as the licensor was authorized to extend the license. Prior to the date specified the licensor had invaded the licensee's territory and refused to recognize the latter's exclusive rights granted, and had obstructed the licensee's efforts to obtain supplies, and a suit had been brought by the licensee to compel recognition of its rights. *Held*, that such acts on the part of the licensor constituted a waiver of the obligation of the licensee, if any, to give notice of its election to exercise its option to take a renewal of the license.

Elisha K. Camp (Louis Hicks and John C. Tomlinson, of counsel), for complainant.

Robinson, Biddle & Ward (C. L. Buckingham, C. M. Hough, Frank L. Dyer, and William Pelzer, of counsel), for defendants.

HAZEL, District Judge. This action is brought to restrain the defendants, Thomas A. Edison, the Edison Phonograph Company, the Edison Phonograph Works, and the National Phonograph Company from selling, leasing, or disposing of phonographs and supplies therefor within the state of New York, and for damages and an accounting. The basis for the action is the alleged infringement of a license or contract made between complainant's predecessors and the North American Phonograph Company (hereafter referred to as the American Company), which the bill charges granted the sole and exclusive rights to use, exhibit, and let phonographs, and to sell and dispose of appliances therefor, in the state of New York. The legal rights of licensees under substantially similar contracts have been several times before the courts of the United States on demurrer and motions for preliminary injunctions. New England Phono. Co. v. Edison et al. (C. C.) 110 Fed. 26; New York Phono. Co. v. National Phono. Co. (C. C.) 112 Fed. 822; New York Phono.

Co. v. National Phono. Co. (C. C.) 119 Fed. 544; Whitson v. Columbia Phono. Co., 18 App. D. C. 565; Rahley v. Columbia Phono. Co., 122 Fed. 623, 58 C. C. A. 639; New York Phono. Co. v. Jones (C. C.) 123 Fed. 197; before Judge Brown in New England Phono. Co. v. Dawson Co. (C. C.) 124 Fed. 1022; and before Judge Carpenter in American Graphophone Co. v. New England Phono. Co. et al. (unreported). The bill charges Mr. Edison and defendant companies with entering upon a plan or scheme to avoid the contracts for licenses, and to hinder and obstruct the complainant in the exercise of its sole and exclusive territorial rights. Service of a subpœna ad respondendum was had upon the National Phonograph Company only.

The salient facts, chronologically stated, are these: Prior to 1888, Jesse H. Lippincott acquired a license of certain patents of Alexander G. Bell, Chichester A. Bell, and Sumner Tainter for the invention known as the "graphophone," for the purpose of exploiting, selling, and manufacturing the same in the United States and elsewhere. At this time Thomas A. Edison had also invented a machine for recording and reproducing sounds and articulate speech, called the "phonograph." On October 28, 1887, the patents obtained by Mr. Edison on his invention were assigned to the Edison Phonograph Company, a corporation owned and controlled by him; the right to manufacture, however, being reserved to him. This right was on May 12, 1888, assigned to the Edison Phonograph Works, a corporation also owned and controlled by Mr. Edison. To unite and consolidate the competing interests in the talking machines, the North American Phonograph Company was organized by said Lippincott, it having been previously agreed in writing between Lippincott and Edison that, upon the formation of such company, the latter would sell to it the entire stock of the Edison Phonograph Works for the sum of $500,000. By conveyance and assignment from Edison, the Edison Phonograph Works, the Edison Phonograph Company, and Lippincott, dated October 12, 1888, the North American Phonograph Company became the owner in perpetuity of the sole and exclusive title and interest in and to the certain patents of the defendant Edison relating to the phonograph, for the express purpose of enabling it to sell to subcompanies and agencies certain exclusive territorial rights throughout the United States and Canada. The company was incorporated on October 12, 1888, under the laws of New Jersey, with an authorized capital of $6,600,000, and Mr. Edison became a stockholder and director therein immediately upon organization. Not only were patents covering the phonograph transferred, but it was agreed that future improvement patents and inventions made within 15 years thereafter were to be assigned to the American Company. The Metropolitan Phonograph Company (hereafter referred to as the Metropolitan Company) was incorporated on October 6, 1888, under the laws of New York. In consideration of the cash payment of $100,000, the American Company granted on October 12, 1888, to the Metropolitan Company, for a period of five years, the sole and exclusive rights to the use of the phonograph and graphophone, and for the use of appliances therefor, and the right to use, exhibit, and

sublet such instruments, and to sell the necessary appliances therefor, within certain specified counties of the state of New York. Such agreement, however, was extended, as will subsequently appear. On February 6, 1889, a similar contract of license for a period of five years, covering territory in the state of New York not licensed to the Metropolitan Company, and comprising the city of New York and certain other specified counties, was granted to one John P. Haines, acting for the New York Phonograph Company, a corporation to be organized thereafter in pursuance of such agreement. The actual cash price paid in consideration of the territorial license to the last-mentioned company was $125,000. Both written agreements contained provisions and restrictions relating to retail prices to be paid by local companies or agencies, manner of buying or leasing instruments and supplies, option for extension of license, and general details regulating the conduct of the business. The New York Phonograph Company (referred to as the New York Company) was, in pursuance of such agreement, incorporated on February 8, 1889, under the laws of the state of New York. In September, 1890, the Metropolitan Company and the New York Company were consolidated into a single corporation, the complainant. The proofs show that the licensees conducted the business for which they were incorporated, in the state of New York, during three years without interference or molestation, but with rather indifferent financial success. Contrary to the expectation of the promoters, the business was not prosperous, and all the witnesses are agreed that the enterprise was unsuccessful because of defects and imperfections in the phonograph, and inability to procure machines with which to do business. Between July 1, 1892, and July 1, 1893, the New York Company, though engaged in business, owned scarcely any assets. For reasons hereafter stated, the business appears to have been conducted at a great disadvantage, and resulted in financial loss. The evidence shows that the defendant Mr. Edison became a controlling stockholder in the American Company in 1889, and in 1893 its president. On July 1, 1893, according to written agreement entered into between the American Company and the New York Company, the latter waived its exclusive rights under the licenses until July 1, 1895, since which time the complainant concededly has not actively engaged in business. By the terms of this suspension agreement, so-called, and upon payment of specified royalties, the American Company was authorized to come into complainant's territory and to exclusively transact the phonograph business. On May 1, 1894, after the suspension agreement went into effect, the American Company became insolvent, and a receiver was appointed. Its assets consisted principally of phonograph patents, shares of stock in the Edison Works, and the good will of the business. All the property of the insolvent corporation, together with contracts for licenses, were sold to Mr. Edison by the receiver at public sale, pursuant to the order of the court. Mr. Edison transferred a portion of his purchase, consisting of patents, shares of stock, and good will, to the defendant National Phonograph Company, which was organized by him, while the interests in the many territorial licenses which had been granted by the American Com-

pany, including those in controversy, were transferred to a trusted
employé named Ott. On February 10, 1896, a few days after the re-
ceiver's sale, a communication was addressed by complainant to Mr.
Edison, requesting that no instruments or supplies be sold or de-
livered in New York except through the medium of the New York
Company. A few days later another letter was mailed and received
by Mr. Edison, requesting an interview in behalf of complainant's
committee. Both communications were ignored.

It is practically conceded that, immediately upon the acquisition by
the National Company of the assets of the American Company in the
manner indicated, it began the sale of phonographs and supplies in the
restricted territory. This fact is also shown by the letters in evidence
under date of March 10, 1896, passing between said company and the
firm of Walcutt, Miller & Co., of New York. In May, 1896, the de-
fendant National Company opened a store for the sale of phonographs
and supplies in the city of New York. Prior thereto, on January 31,
1898, a committee of the complainant company was appointed, pursuant
to resolution adopted by its directors, to confer with the defendant
Edison regarding his apparent hostile attitude, and his evident disre-
gard for complainant's rights under the contract. Thereafter the com-
mittee, Mr. Edison, and Mr. Gilmore, president of the National Com-
pany, met to discuss the unsettled question. Complainant's claim to
an exclusive license was asserted with renewed insistence. Mr. Edison
replied that he would sell phonographs to the New York Company on
the same basis as to other agents, and not otherwise. He also stated,
in substance, that complainant had better establish its rights by litiga-
tion. Further negotiations towards a settlement of existing differences
were, at Mr. Edison's request, continued with his counsel, but with no
success. The witnesses for complainant, and Mr. Dyer, witness for
defendant and counsel for Mr. Edison, are not agreed as to the exact
purport of the negotiations. Mr. Haines, witness for complainant, de-
clares the interviews to have been unsatisfactory and evasive. His
criticism of the conversations is corroborated by other members of the
committee. Upon this point Mr. Dyer testified that the object of the
interviews with complainant's committee, and other negotiations had
about the same time with its counsel, was not to arrange for the return
of the New York Company to the phonograph business, but, on the
contrary, that complainant desired a settlement which contemplated a
purchase of its license by defendants. At this time the phonograph
and graphophone business was increasing, and gave hopeful promise
of financial success. The machines had been improved by the adoption
and use in 1897 of a so-called "spring-power attachment" invented by
the United States Company. The general public became interested in
the amusement feature of the instrument, and the asserted territorial
rights of the complainant increased in value. Much testimony is found
in the record regarding the substitution by the National Company of
the spring-motor attachment to the phonograph in place of an electric
battery. The suggestion that Mr. Edison, prior to the suspension
agreement, designedly withheld his approval of the substitution of the
later device, is not sustained by the proofs. Complainant's theory is
that the early imperfections of the talking machine could have been

obviated by using the spring power and another form of molded record, but the evidence establishes that Mr. Edison doubted the efficiency of the suggested improvement. The failure of the American Company or Mr. Edison to supply this improvement (which was not of his invention) in the earlier period of the exploitation of the phonograph certainly does not establish the claim that any improvements were withheld by him. Nothing further occurred until the bringing of this suit in January, 1901. Neither the American Company nor its successor, the defendant National Company, gave the 30-day notice required by subdivision 10 of the contract, which, in effect, declares that if the licensee neglects or fails to take measures to supply a demand in any portion of the licensed territory for phonographs or phonograph-graphophones, or appliances therefor, then the licensor may supply the demand through its agents, but only to the extent of complainant's default. In explanation of the failure of the National Company and Mr. Edison to give the specified notice, it is argued that it was well known that when the National Company came into the field the complainant had abandoned its license and was practically unable to carry out the provisions of the contract, not only on account of its evident reluctance to re-enter the field of operation, but because of its insolvency. The testimony, however, is to a different effect. The witnesses, Fahnestock and Lewis, testified that, had the New York Company received the notice mentioned, it would gladly have met the demand for machines, as it was desirous of increasing its business. During the entire period of time mentioned, several offices were and still are maintained by complainant in the city of New York and at Tarrytown, N. Y., annual elections of officers have been regularly held, and the board of directors have met for the transaction of business frequently since 1895. Other evidence is found in the record which will be mentioned herein when pertinent.

Complainant insists that, when the defendant Edison bought the assets of the North American Company, he did so with full knowledge of the facts, and, moreover, when the National Company, which had been organized by him, acquired the assets of the American Company, it also had full knowledge of the pre-existing contractual relations, i. e., that the complainant was the exclusive licensee for the entire state of New York for a period of time stated in the contract. Hence, according to the decisions, the stipulations and conditions between the American Company and the complainant were binding upon it.

In New England Phono. Co. v. Edison et al., supra, Judge Gray, on the assumption that the bill correctly set out the contract, decided:

"That the said contract contained an implied negative covenant not to sell or deal in the articles or matters in regard to which the said exclusive right was granted, and that the defendant Thomas A. Edison owned and controlled the defendant companies, and that he and they succeeded to the rights and responsibilities of the North American Phonograph Company in regard to the contract in question."

When the bill in suit was considered on demurrer by Judge Wheeler, who had before him the licenses, he, assuming the truth of the allegations of the bill, stated in effect that one who knowingly, in pursuance of a scheme, independently sells and uses phonographs and supplies in

violation of a complainant's contract rights, such salable articles coming from the same source, unjustifiably invades the legal rights of the complainant. The principle appears to be well settled that where there is an exclusive right, and such right is wrongfully invaded or violated by one having knowledge of the contractual relations, a court of equity may be invoked to redress the breach of covenant. Appollinaris Co. v. Scherer (C. C.) 27 Fed. 18; Standard Fashion Co. v. Siegel-Cooper Co., 30 App. Div. 564, 52 N. Y. Supp. 433. In the Whitson Case, supra, the Circuit Court of Appeals for the District of Columbia, having a similar license before it, said:

"Any person, natural or artificial, into whose hands, after the execution of the contract between the North American Company and the Columbia Company, the control of the Edison patents came, with knowledge or notice, actual or constructive, of the existence of such contract and of the rights of the Columbia, must be assumed to have taken subject to such rights, and to be disqualified from infringing in any manner the exclusive license given to the Columbia Company. If this were not so, it is very plain that rights granted under a patent might be destroyed with impunity, against the will of the owner of the rights, by the mere transfer of the patent."

As already indicated, the doctrine is well established that a license follows the assets of the licensor into the possession of him who buys with his eyes open to the pre-existing contractual relations and existing equities. The assets of complainant's licensor in no sense innocently came to Mr. Edison or his assignee, nor were they freed from the obligations created by the contracts of license. The transfer to Ott of the interest of the American Company in the licenses cannot be considered in any other light than an ill-advised attempt to evade contractual liability. Whether it was the intention of the transferror to dissolve the American Company and make room for a successor is not thought to be material. The assets were bid in and purchased "as a going concern," and the receiver turned the remaining business over to the purchasing company. Being in possession, therefore, of all the facts, and having succeeded to the rights of the American Company, the National Company has nevertheless unwarrantably invaded the licensed territory of the complainant. That the contractual rights of the New York Company have been obstructed and interfered with in the manner indicated cannot be seriously controverted.

The defenses principally relied on challenge complainant's right to enforce its exclusive license on account of its unexplained laches, and deny that an extension of license was acquired under the provisions of the contract.

The question of laches will be first considered. The principal circumstances of each case must govern the application of the rule. It is true that, immediately after the receiver's sale of the assets of the North American Company, it became apparent that Mr. Edison did not regard that complainant's license survived the dissolution of the American Company. His declarations to complainant's committee, as already observed, were in effect an unalterable repudiation of the asserted claims to a subsisting license. There was no room for misunderstanding. Under the circumstances of this case, what was complainant's remedy, and when should it have been brought to the attention of a proper tribunal? The circumstances undoubtedly demanded

·that the limit of time be measured in which to seek relief. Upon this point defendants vigorously contend that complainant was cognizant of the invasion of its territory by the National Company from the beginning, and that, assuming the paramount rights of the complainant, Mr. Edison's refusal to recognize such rights should have admonished the complainant to seasonably question the interference by immediately commencing suit to establish its rights. These propositions are untenable. According to one of complainant's witnesses, no action was earlier instituted on account of lack of funds. The facts and circumstances are not convincing that the complainant has slumbered on its rights. The maxim that "the laws serve the vigilant, and not those who sleep," has application only where the party is silent, and permits an interference with his alleged rights, without adequately and seasonably protecting them. This litigation was instituted within five years after the incorporation of the defendant National Company, and within less than three years from the termination of fruitless negotiations to settle existing differences. It already appears that the actual invasion by the defendant National Company of complainant's territory by opening therein a place of business was in May, 1898. Nothing is shown from which it may be justly concluded that the National Company or its codefendants believed that complainant acquiesced in such intrusion, or that there was an abandonment of, or an intent to abandon, its asserted rights in the license. The contrary appears.

The doctrine of laches, as expounded in the following cases, is thought to apply: Bradford v. Belknap Motor Co. (C. C.) 105 Fed. 63; Ide v. Carpet Co., 115 Fed. 137, 53 C. C. A. 341; Richardson v. Osborne & Co., 93 Fed. 828, 36 C. C. A. 610; Saxlehner v. Eisner & Mendelson Co., 173 U. S. 704, 19 Sup. Ct. 886.

Defendants contend that complainant, on account of its insolvency both before and after the expiration of the suspension agreement, was practically unable to resume the phonograph business, and hence there was an abandonment of its contract rights. The provisions of the agreement, fairly interpreted, undoubtedly require the complainant company to operate the business and to fulfill its contractual obligations. This it was willing to do, as appears by the oral evidence, and by the first letter addressed to Mr. Edison following the receiver's sale. It has been held that a breach of covenant does not work a forfeiture of the license per se, unless a condition to that effect be inserted in the agreement. White et al. v. Lee (C. C.) 3 Fed. 222; Consolidated Middlings Purifier Co. v. Wolf et al. (C. C.) 28 Fed. 814. Subdivision 14 of the contract in terms authorized the licensor, upon written notice, to immediately terminate all the rights granted upon failure to perform certain conditions, and in the event of the licensee becoming bankrupt or insolvent, as therein provided. No such notice, however, is relied upon to terminate the license, and admittedly none has been given either by the American Company or its successors, the defendants. Assuming, therefore, the insolvency of complainant, in the circumstances of this case, it is doubtful whether the defendants can be heard to assert complainant's insolvency. There is no doubt that complainant could have procured any necessary finances to actively establish the business if the defendants had acquiesced in its exclusive

license and furnished phonographs and supplies under such license, after acquiring the assets and good will of the American Company.

The next defense is that the license contracts in question were not in effect extended beyond a period of five years, for which they were originally granted. Assuming a grant of exclusive territorial rights, the defendants contend that the option of a second term was not exercised. The preliminary provisions of both the Metropolitan and the New York agreements, under which the licenses were to be extended until 1903, are substantially identical. The original licenses are to continue for five years, and such further time as the parties may afterwards determine. The original Metropolitan agreement provided that the period limited may further be extended upon the performance of a covenant stating, in substance, that the company would, at or before the expiration of the original term, increase its capital stock in the amount of $250,000, and deposit the same with the Central Trust Company for delivery to the American Company or to Lippincott, trustee, or his successor, and, upon notice to the American Company of the deposit of such stock with the trust company, the American Company shall forthwith deposit with said trust company the extension license until March 26, 1903, for delivery to the Metropolitan Company. Such deliveries by the trust company were to be made at the expiration of the original term of the licenses. In pursuance of said agreement, and on June 23, 1890, the extension license referred to in the original contract was executed and deposited with the Central Trust Company, the $250,000 of stock having been likewise deposited. The original license to the New York Company also contained a provision regarding a similar deposit of stock and of an extended license with the trust company. Such deposits of stock and extension licenses were made pursuant to said original agreements. The Central Trust Company accepted the deposits mentioned, and acknowledged receipt thereof. The extension licenses contained the following provisions, being clauses 2 and 3 in the Metropolitan agreement and 3 and 4 in the New York agreement:

"Second (Third). It is further agreed that on the 6th day of February, 1894, said Central Trust Company of New York shall, without further direction from the parties hereto, or either of them, and without or further consideration, deliver and transfer to said Jesse H. Lippincott, trustee, or his successor, said Two thousand five hundred shares of stock, and shall, at the same time, deliver to the party of the first part and to the party of the second part hereto each one copy of this agreement or extended license, which is executed and deposited, in duplicate, this day with said Central Trust Company of New York, and the party of the second part shall be immediately entitled to the possession of said extended license upon the delivery to said Jesse H. Lippincott, trustee, or his successor, of said shares of stock.

"Third (Fourth). It is further agreed, that upon delivery, as aforesaid, to said Jesse H. Lippincott, trustee, or his successor, by said Central Trust Company of New York of said shares of the capital stock of the party of the second part, and upon the faithful performance by the party of the second part of all the covenants and agreements made incumbent upon it by said agreement of February 6th, 1889, then that this agreement shall become and shall confer upon and shall fully and entirely vest in the party of the second part an extension of the rights granted to and conferred upon the party of the second part by said agreement of February 6th, 1889, and the subsequent assignment to it for a further period and until the 26th day of March, 1903,

and for such further time at the option of the party of the second part as the party of the first part may be authorized to extend such license; subject, however, to the covenants and agreements of said agreement of February 6th, 1889, as fully and entirely as if said agreement had been in the first instance made to cover the period of the extension granted hereby, as well as the period originally thereby fixed and limited."

On October 3, 1894, subsequent to the delivery to the trust company of the stock certificates and said extension licenses, the complainant, by its executive committee, notified the trust company not to deliver the stock certificates deposited, as agreed under both contracts, "pending the settlement of certain claims of this company against said stock." A similar notice in writing was given to the stock transfer agents not to make the transfer of such capital stock standing in the name of said Central Trust Company, trustee, until further notification. Later, on June 20, 1902, after the commencement of this suit, the above notices were in effect canceled and revoked, and, after some correspondence between the trust company and complainant, the extension licenses were delivered to complainant. Another notice, however, was given to the depositary to withhold the certificates of stock on account of a claim against the receiver of the American Company. The shares of stock were never demanded by Mr. Lippincott or any other person or corporation. Defendant now contends that the context of the provisions relating to the extension plainly shows a license for two terms, namely, one for five years and the other for ten; that the amount of money paid, viz., $100,000 by the Metropolitan Company and $125,000 by the New York Company, was for the first term, while, for the second, the consideration was the number of shares of capital stock deposited with the trust company, and hence, when the depositary was notified not to deliver the capital stock, there was, in legal effect, a rescission of the contract. This interesting problem is difficult of solution.

In pursuance of the intention of the parties, plainly apparent from the context of the contracts, it is thought that the agreements for extensions of license were completed contracts, and not dependent upon a future occurrence or contingency. The Central Trust Company, without further direction from either of the parties, was authorized and empowered to deliver the possession of the stock and the agreements, as therein expressly provided. It received the stock without any accompanying reservations or limitations, and therefore it was not an escrow dependent upon the performance of future conditions. The subsequent notice to the depositary not to make delivery of the stock could not affect the contract rights, as the delivery of the stock was not essential to its effectiveness. The ownership of the shares of stock had passed from complainant to another. There was a constructive delivery, and, accordingly, the title actually vested in Lippincott, as trustee, or his successors. On deposit of the shares of stock, the complainant was unquestionably, at the termination of the original license, entitled to the possession of the documents extending the same. The proviso that the rights shall not be conferred or become vested unless the covenants are faithfully performed is not thought to have been a restriction upon the depositary in the

136 F.—39

delivery of the stock, as provided. As already intimated, the intention of the parties must be learned from the entire contract. Careful consideration of the clauses covering the point in question warrants the conclusion that the deposits of the stock and the extension licenses were considered as a part of the original license. The contract is not separable or divisible in the sense that the money paid was in consideration of the first item, and the delivery of the capital stock for the second. Moreover, the transaction could not be recalled without the consent of the interested parties, and the delivery of the shares of stock in the manner indicated in the agreement was not revocable by the complainant.

But it is suggested that the embargo on the stock prevented the depositary from making the disposition intended by the solemn act of the parties, and that consequently the owner was deprived of the use of his property, and hindered in its control. This proposition ignores the rule that any direction to a depositary, by a party to a completed contract, in contradiction of or inconsistent with the agreement under which the deposit was made, is inoperative. Stanton v. Miller, 58 N. Y. 192. So that, irrespective of whether the Central Trust Company could lawfully deliver the stock to the American Company or its receiver, or whether such depositary was restricted in its delivery to the actual person or persons mentioned in the contracts, the notice of cancellation was entirely independent of the contract, and could not legally affect the disposition or delivery of the stock, as previously agreed between the parties. As stated in complainant's brief:

"The assertion by the New York Phonograph Company of the existence of a valid claim against said stock in its favor, arising, for all that appears, independent of the contract under which the certificates were deposited, and subsequent to the time when it became absolutely entitled to the physical possession of the agreements 'extending licenses,' and its consideration of which rights, if any, were acquired by the National Phonograph Company and Ott to the said stock, have really no bearing upon the contract rights of the complainant."

I agree that the "stop notice" was entirely outside of the provisions of the contract, and, therefore, could not have served the purpose intended. The reasons for deferring the delivery of the stock until after the expiration of the original term is not material. Furthermore, the proofs show that all the parties have heretofore treated the contract as an extension of the original term. Indeed, the exclusive rights of the complainant was recognized in an action brought against the receiver to recover royalties upon instruments sold during his receivership, and such royalties were paid pursuant to the order of the court for sales of phonographs after the expiration of the original term of the license. Had there been no extension of the license under contract of February 6, 1889, the same would have expired on February 6, 1894, prior to the appointment of the receiver. The language of the agreement is as follows:

"The rights granted by the original contract shall remain in force and this agreement shall continue until the 6th day of February, 1894, and for such further period as hereinafter provided, unless sooner terminated as hereinafter provided."

This brings me to a consideration of the next point, namely, whether the licenses herein were extended beyond the second term. As has been observed, the original New York Company license was until February 6, 1894 (the Metropolitan Company license expiring earlier), and later, as has been stated, both licenses were extended until March 26, 1903. The original and extension licenses, after setting forth the conditions of the second term, contained this provision:

"Such further time, at the option of the party of the second part, as the party of the first part may be authorized to extend said license."

Complainant insists that the limited period specified, namely, March 26, 1903, applied only to the graphophone; that, with regard to the phonograph, the time to which the licenses were capable of being enjoyed was entirely controlled by the rights of the American Company in perpetuity, and, as that company was succeeded by the National Company, the latter must be held bound to strictly carry out the obligations of the former. There is no evidence that the complainant ever exercised the option clause of the contract, and therefore it is difficult to conceive upon what equitable ground the complainant is entitled to any rights beyond the second term. The language of the option is vague and indefinite, and does not specify on what terms, if any, it becomes effectual, or whether any consideration should be paid therefor. Manifestly, if the complainant had been enabled to perform its part of the contract, another agreement to extend the term beyond the period expressly limited would have been necessary.

This disposes of the primary and controlling questions, and it is deemed unnecessary to pass upon others presented.

The licenses having expired since the commencement of this suit, no injunction will be granted. Decree for an accounting, with costs, allowed against the National Phonograph Company.

## On Rehearing.

This is an application by complainant for a rehearing of this cause and for leave to introduce additional proofs. A decision in complainant's favor, rendered January 5, 1905, allowed an accounting, and held that no injunction should issue, as the licenses in question had expired and complainant had failed to exercise its option to extend the same. The petition for rehearing recites that, because of the opinion of the court, full and complete reargument, and the production of further available proofs upon the question whether the licenses were extended beyond March 26, 1903, becomes essential, lest injustice be done, if the cause be decided on the present record. Defendants contend that under well-established rules of procedure the hearing sought should not be allowed, on the ground that the evidence now offered is not newly discovered, and complainant has not been misled or surprised. This contention, persuasive of its correctness in a majority of cases, need not be discussed, as a careful review of the original decision and re-reading parts of the evidence satisfies me that the former ruling was er-

roneous, in that complainant was not afforded all the relief to which it is entitled.

The contention that the complainant's rights under the licenses remained in force subsequent to March 26, 1903, was fully argued at the hearing, and sufficient evidence is found in the record in support thereof, although it was not given the importance which I now believe it merits. The opinion, after stating:

"As has been observed, the original New York Company license was until February 6, 1894 (the Metropolitan Company license expiring earlier), and later, as has been stated, both licenses were extended until March 26, 1903. The original and extension licenses, after setting forth the conditions of the second term, contained this provision: 'Such further time, at the option of the party of the second part, as the party of the first part may be authorized to extend said license'"

—points out that there is no evidence that complainant ever exercised such option clause, and, accordingly, it was difficult to conceive upon what equitable grounds it was entitled to assert any rights beyond the second term. The excerpt from the licenses is misleading, and does not correctly disclose the period of time for which they were equitably extended. The paragraph containing the term of extension in the agreement of June 23, 1890, between the American Company and the Metropolitan Company, reads as follows:

"Third. It is further agreed that upon delivery, as aforesaid, to said Jesse H. Lippincott, trustee, or his successor, by said Central Trust Company of New York, of said shares of the capital stock of the party of the second part, and upon the faithful performance by the party of the second part of all the covenants and agreements made incumbent upon it by said agreement of October 12th, 1888, then that this agreement shall become, and shall confer upon and shall fully and entirely vest in the party of the second part, an extension of the rights granted to and conferred upon the party of the second part by said agreement of October 12th, 1888, for a further period and until the 26th day of March, 1903, *and for such further time as the party of the first part may be authorized to extend such license;* subject, however, to the covenants and agreements of said agreement of October 12th, 1888, as fully and entirely as if said agreement had been in the first instance made to cover the period of the extension granted hereby, as well as the period originally thereby fixed and limited." (Italics mine.)

It will be noted that the words "at the option of the party of the second part," upon which stress was placed in the original opinion, are omitted, although such words of apparent limitation are contained in the original and extension licenses to the New York Company and in the original (not extension) license to the Metropolitan Company.

The question for further consideration is whether the franchise rights granted to the Metropolitan Company were extended for the full period of time for which the licensor had authority to extend the same, or, as the court assumed, whether such rights were wholly dependent upon the formal exercise of the option and the necessity of another agreement to extend the term. Complainant lays stress upon the perpetuity clause of the contract between Mr. Edison, the Edison Companies, Lippincott, and the American Company, by which it was agreed that the phonographs and supplies

for use in the United States and Canada should be exclusively manufactured by the Edison Phonograph Works in perpetuity. Complainant insists that the licenses were in effect extended beyond the date mentioned in the contract, and for such period as the American Company by its agreement with the Edison Works was authorized to extend the same. The argument proceeds upon the theory that, as the American Company acquired legal title to the Edison phonograph patents, the license granted by that company to the Metropolitan Company continued during the life of the patents, and, the manufacturing contract between the American Company and the Edison Works being in perpetuity, the license privileges conveyed to complainant's predecessors were likewise perpetual or of indefinite duration. This inference, however, is not warranted by the law or facts.

The parties to the various contracts undoubtedly intended to effect a mutually beneficial plan of co-operation in promoting and exploiting the phonograph, and to maintain, preserve, and perpetuate the relations established by the contracts. Hence such rights, franchises, and privileges as the American Company had authority to convey were conferred upon complainant's predecessors. The agreements by which the patents were transferred to the American Company, and the established rights of the parties, considered in connection with the testimony of Mr. Edison, unquestionably warrant a determination that the parties actually intended their relation to be continuous and lasting. Such contracts not only in terms assigned to the American Company the then existing phonograph patents and those applied for prior to August 1, 1888, but also any invention or improvement upon the phonograph made within 15 years.

What precise meaning may be given to the words "in perpetuity" (contained in the contract between the American Company and Edison Phonograph Works) is not necessary to a decision here. The duration of the manufacturing contract, as to whether it was continuous, perpetual, or limited, does not affect the authority to extend the licenses in question, which the American Company had under the agreement by which the patents were sold to it and the exclusive rights granted as hereinabove mentioned. That the franchises, rights, and privileges secured were transmissible to complainant's predecessors upon the terms and conditions specified in the contract must, therefore, be conceded. It is well settled that a patent does not carry with it any rights beyond the term of the patent, or, in the words of Robinson on Patents, § 815:

"A patentee is not permitted to issue a license beyond his own right."

It may be noted for illustration that an extension of the term of the patent, which, in certain cases, was permitted under the prior act, does not inure to the transferee of a license, in the absence of language expressive of such intention. Hodge et al. v. Hudson River R. Co., 6 Blatchf. 85, Fed. Cas. No. 6,559; Wilson v. Rousseau et al., 45 U. S. 646, 11 L. Ed. 1141; Mitchell v. Hawley, 6 Fish. 331, Fed. Cas. No. 6,250; Id., 16 Wall. 544, 21 L. Ed. 322.

Furthermore, it is held that, during the period wherein an exclusive right has been granted, the patentee or licensor cannot invade the territorial license without infringing the grant, and that, in the absence of express provision covering the duration for which a license is granted, the legal presumption is that the parties meant to continue their relations during the term remaining at the time the license or privilege is conveyed. This would seem to preclude the possibility of the license to complainant's predecessors containing a perpetual covenant or valid provision continuing the term beyond the life of the patents. However, a more serious problem is found in the suggestion that the extension clauses contained in the licenses to the Metropolitan and New York Companies were self-executing, and continued beyond March 26, 1903, without the exercise of formal choice or the making of another agreement. As we have seen, the license to the Metropolitan Company does not expressly require giving notice of any desired extension, and contains no option clause. The phraseology of the paragraph containing the right of enlarging the terms of the licenses, though somewhat confusing and indefinite as to duration, must be read in connection with the prior contracts between Mr. Edison and the companies alleged to be under his control and the American Company. The rule is that the circumstances surrounding the transaction, the subject-matter of the arrangements, and the prior acts of the parties must govern the effect given to uncertain or equivocal phraseology in the contract. Del., L. & W. R. R. Co. v. Bowns et al., 58 N. Y. 573.

The words "for such further time as the party of the first part may be authorized to extend such license," inserted in the license, when considered in relation to the covenants contained in the agreements whereby all inventions or improvements in the phonograph made by Mr. Edison within 15 years were to be assigned to the American Company, would seem to clarify the evident uncertainty of the extension clause. Manifestly, at the time of executing the licenses, the parties were unable to specify and determine the period of their continuance, as that apparently was dependent upon future improvements in the phonograph and the status of the parties at the expiration of the original term. Such an interpretation of the intention of the parties induces the holding that, inasmuch as improvements were made subsequent to the contract of August 1, 1888, to wit, in the years 1888, 1889, 1890, 1891, 1892, and 1893, and patented by Mr. Edison, the license privileges or franchises granted by the American Company to the Metropolitan Company continued, without the necessity of further terms or conditions expressive of such intention. Such being the fact, the American Company had authority and power to convey the privileges mentioned in the agreement until the expiration of the life of the phonograph and improvement patents.

The New York Company license:

Except as hereinbefore pointed out, the provisions under which the duration of both licenses was extended are the same. The legal

effect of the option in the New York Company license, in my opinion, was to enable that company, if it so desired, to abrogate the existing relations. This conclusion is not reached without hesitation, but further consideration of the evidence warrants holding that the option was in effect a reservation of a right to the licensee to discontinue the existing relations on March 26, 1903, if it no longer wished to co-operate in the enterprise. The extension of the license, obtained by the deposits of stock and of the extension license in the manner hereinbefore indicated, was for five years, and for such further time, at the option of the New York Company, as the licensor was authorized to extend the same. This evidently was a positive grant, and its terms, doubtless, were perfectly understood by the parties. As indicated, there is abundant evidence in the record from which the intention of the parties to extend the license to March 26, 1903, may be ascertained. Defendants' contention that it was necessary, as a condition precedent, that complainant should formally notify the American Company, or its successors, on March 26, 1903, whether it elected to continue under the license granted to the New York Company, or preferred to exercise its option, is thought not to be maintainable. Not only was this action instituted prior to March 26, 1903, to compel a recognition of complainant's rights under the licenses, but. complainant in many ways, as shown by the proofs, evidenced its intention to continue in the phonograph business and to exercise the right of carrying on the same under the license agreement. Its franchise rights, however, as has been stated, were persistently ignored and disputed by Mr. Edison and the defendants. That complainant endeavored to obtain phonograph records and supplies from other dealers when defendants refused to supply the same (as permitted by the terms of the license) is also shown. Attention is directed to the evidence showing that complainant's efforts to obtain phonograph supplies were obstructed by a suit instituted by defendant National Company against Leeds, Catlin & Co., to enjoin them from supplying phonograph records or appliances to complainant. As already observed, the defendants, in my judgment, by their acts must be deemed to have regarded the extension clause as self-executing and operative beyond the period therein specified. Moreover, the invasion of complainant's territory by the National Company, the refusal on the part of the defendants to recognize their exclusive rights granted, together with the institution of this action, would seem to have excused the New York Company from formally exercising any option. Such an act, in the circumstances presented, became nugatory and an idle ceremony. The principle is applicable that he who obstructs another in the performance of an act which otherwise would be obligatory may not avail himself of the nonperformance which he himself has occasioned. Dolan v. Rodgers, 149 N. Y. 489, 44 N. E. 167; Shaw v. Insurance Co., 69 N. Y. 286.

My conclusion is that a rehearing of this cause is not necessary. A re-examination of the record warrants the correction of the pre-

vious opinion; and hence complainant is entitled to an injunction and accounting as prayed for in the complaint. Such injunction, however, may be stayed until determination by the Circuit Court of Appeals of the questions presented, provided, of course, an appeal is taken and seasonably prosecuted. A decree in conformity with the foregoing opinion may be entered.