STANDARD OIL CO. et al. v. CLARK,
Atty. Gen.

No. 185, Docket 20406.

Circuit Court of Appeals, Second Circuit.

Sept. 22, 1947.

918

See also Standard Oil Co. **v.** Markham, 57 F.Supp. 332; Id., 61 F.Supp. 813.

Theodore S. Kenyon and John W. Davis, both of New York City (Kenyon & Kenyon, Edgar F. Baumgartner, Ralph M. Carson, Harold W. Bissell, and Taggart Whip-

ple, all of New York City, on the brief), for plaintiffs.

M. S. Isenbergh, Sp. Asst. to Atty. Gen., and James L. Morrisson, Atty., Claims Div., Dept. of Justice, of Washington, D. C. (John F. X. McGohey, U. S. Atty., of New York City, John F. Sonnett, Asst. Atty. Gen., Harry LeRoy Jones, Sp. Asst. to Atty. Gen., John Ward Cutler, Acting Gen. Counsel, and Maximilian Friedmann, Atty., Office of Alien Property, Dept. of Justice, both of Washington, D. C., on the brief), for defendant.

Before CHASE, CLARK, and FRANK, Circuit Judges.

## CLARK, Circuit Judge.

This is an action to recover property claimed to have been wrongfully seized and vested in himself by the Alien Property Custodian, brought by four corporations usually referred to as the "Jersey" group. The corporations are the parent holding company, Standard Oil Company (New Jersey), referred to as Standard, and three subsidiaries: Standard Oil Development Company, called Development; Standard Catalytic Company, originally S.I.G. Company, thereafter Standard I.G. Company, and usually referred to as S.I.G.; and Jasco, Incorporated. The property in question was vested by the Custodian in himself as being the property of the German corporation, I.G. Farbenindustrie, A.G., called I.G.; but the plaintiffs' contention is that it is, instead, owned by themselves, American corporations. It consists of shares of stock of American corporations and United States patents in the hydrocarbon field for the treatment of natural gas, crude petroleum, coal, and other materials to produce marketable products in the oil, natural gas, and gasoline industries. Specifically it consisted of 200 shares of S.I.G. stock, 5 shares of Jasco stock, 425 shares of Hydrocarbon Synthesis Corporation (USAC) stock, many hundreds of patents relating principally and directly to the hydrocarbon field called Class A S.I.G. patents, many hundreds of patents merely useful in that field called Class B S.I.G. patents, and many Jasco patents relating to the Acety-

lene Arc, Paraffin Oxidation, Oppanol, and Buna processes.

The case presents a fascinating picture of the interrelationships of two vast private commercial empires, among the largest in the world, acting in hearty co-operation in division of their respective fields of operation and making and executing plans for continuance of that co-operation under the stress of developing friction and approaching war between the countries of which they were, after all, respectively nationals. For the purposes of this appeal we need not attempt to set forth that extensive history in detail; as a matter of fact, Judge Wyzanski, in his careful and searching decision below, Standard Oil Co. v. Markham, D.C.S.D.N.Y., 64 F.Supp. 656, has made the labors of review as light as the momentous nature of the issues permit. Broadly speaking, the great German I.G. Farbenindustrie, A.G., had developed original means and methods of manufacture and production with respect to gasoline, oils, and rubber, of which the Jersey group desired to obtain rights of exploitation, particularly in the light of its concern with the apparently limited reserves of oil in the world. So negotiations were opened in 1926; and from 1929, agreements were entered into by the respective parties to this end, which involved, among other things, the organization of new jointly controlled companies—S.I.G. and Jasco—and payments going into the many millions by the American to the German interests for the rights thus obtained. The District Court has held those arrangements, as had prior to October, 1939, legal so far as the Trading with the Enemy Act is concerned. But at that date the outbreak of World War II had already occurred, and the parties made arrangements then for the transfer of stocks, patents, and other property to the American interests. These latter transfers the court adjudged to be sham, made with the intent of merely passing an apparent title against later possible seizure by the United States Government in the event of war—an event which the parties correctly foresaw—with beneficial ownership still in fact with the German corporation. Hence in broad outline the judgment below returned to the plaintiffs the property ac-

quired before the October, 1939, agreement and refused to return the remainder. And so both opposing parties appealed.

Thus the ultimate issues below and here turn upon the determination of the ownership of the specific blocks of stock and of the patents, the existence or nonexistence of equitable rights in the patents, and the ownership and extent of those rights. These problems are complicated by a consent decree entered in 1942 in a prosecution of the plaintiffs and others, including individual officers of the companies, for violation of the antitrust laws, since this decree has some bearing upon the parties' rights in the patents. Before the specific problems are reached, however, we must also consider two general over-all defenses which were rejected by the court below. These are that plaintiffs are barred from bringing the action at all, since they have acted to conceal the American assets of a then friendly foreign power; and that plaintiffs may not recover because of lack of clean hands and violation of the Sherman Antitrust Act.

1. *I.G. and Jersey Interrelations.* The earliest transaction between I.G. and the Jersey group important in this case was the Four-Party Agreement, reached in 1929. Pursuant to its terms, S.I.G. was created to exploit outside Germany certain patents belonging to I.G. The patents were divided into two groups, the Class A S.I.G. patents, relating wholly or principally to the hydrocarbon field, and the Class B S.I.G. patents, important in other fields, but also useful in the hydrocarbon field. S.I.G. issued 1,000 shares of stock at $100 per share. This was divided 4/5 to Standard and 1/5 to I.G. S.I.G.'s profits were limited to $11,000 per year, but its royalty income was to be paid to I.G. and the Jersey group roughly in proportion to their stock holdings. This agreement was put into effect and patents and rights in patents were assigned to S.I.G.

In 1930, the parties signed an agreement pursuant to which Jasco was created. The agreement concerned new processes of both I.G. and the Jersey group for producing chemical products from crude petroleum, natural bitumen, or natural gas. In this document both parties agreed to negotiate concerning the terms under which newly discovered specific processes were to be assigned to Jasco for development and exploitation. Jasco issued 10 shares of stock, which were divided evenly between I.G. and Development. Until the later Hague Agreement the only process in which the parties purported to give Jasco substantially more than a right to conduct experiments was the Oppanol process.

In 1938, I.G. and Standard, together with two other parties—the Royal Dutch Shell group and the Kellogg Corporation—formed the Hydrocarbon Synthesis Corporation, also called USAC, to control the exploitation of certain processes for the manufacture of gas and gasoline. Of the 1,700 shares of stock issued by this corporation, Shell and Kellogg each took 425 or 1/4, and S.I.G., acting as agent for the I.G. and Jersey interests, took 850.

With the approach of the war the Jersey group sought to forestall interference or participation by the United States Government in the management of its interests and property. Its general means toward this end was to have property interests owned by I.G. transferred or apparently transferred to itself. Pursuing this policy, Standard in early September, 1939, purchased I.G.'s stockholding in S.I.G. for $20,000, the original purchase price.

In late September, 1939, representatives of the Jersey group and I.G. conferred at The Hague, Netherlands. At this conference the parties made a number of formal changes in their Jasco relationship. A recitation was made that Jasco was the equitable owner of all patent rights of the parties in the Oppanol, Paraffin Oxidation, Acetylene Arc, and Buna processes. I.G. agreed to transfer its stock in Jasco to Development. The terms of the Jasco Agreement providing for division of royalties between the parties on a percentage basis were scrapped in favor of a division of Jasco's rights on a territorial basis. I.G. released to Jasco its royalty rights under the Jasco Agreement. In return, Jasco was to assign to I.G. all its patent rights under the four processes outside the United States and nations thought by the parties

to be at war with Germany. Presumably Development was to retain ownership and control of the processes in these nations through its stock ownership of Jasco and whatever rights it had under the Jasco Agreement. Other action was also taken at the Hague Conference. Dr. Ringer, one of I.G.'s representatives, brought with him assignments in blank for all the Class A S.I.G. patents which had not yet been assigned to S.I.G., for some of the Class A S.I.G. patents which had already been assigned to S.I.G., for all the Class B S.I.G. patents, and for patents for the Acetylene Arc, Paraffin Oxidation, and Oppanol processes. These he delivered to Howard, Jersey's representative, president of Development and a vice-president of Standard. There was also some discussion at the Hague Conference regarding USAC stock, but there is no evidence of any formal action thereon by the conferees. But by a substantially contemporaneous exchange of cables between I.G. and Development, certain formal changes were made in the ownership of USAC stock. In place of the 850 shares held by S.I.G. as agent, new shares were issued to S.I.G. without mention of the agency. Later Development purchased from I.G. for $100 "whatever title you [I.G.] may have" in the 170 shares which S.I.G. had originally held for I.G.

After the execution of the Hague memorandum, Development paid to a pledgee of I.G.'s 5 shares of Jasco stock $146,000 out of I.G.'s funds. Out of its own funds the Jersey group paid $4,000 to a Dr. Duisberg, a representative of I.G. in New York. Thereafter the shares were delivered to Jersey. The shares were transferred in trust to certain Jersey executives for domestic business considerations. (In fact they were designed to evade commitments on other co-operative contracts with domestic concerns.) For similar reasons reassignments of the S.I.G. patents were secured from I.G., and these reassignments ran in trust to another official of the Jersey group.

2. *Steps by the United States.* In broad outline these were the transactions which had been had by I.G. and the Jersey group in connection with the property in suit up to the time when the United States Government stepped into the picture. On March 25, 1942, at 2:15 P.M., the Alien Property Custodian served upon plaintiffs a vesting order which, as later amended, covered all the property interests now in suit. Later that day the United States District Court for the District of New Jersey entered a consent decree in an action brought that day by the United States against the present plaintiffs and others for violation of the antitrust laws. The Alien Property Custodian was a party to this suit and consented to the decree. Among other provisions, the decree declared unlawful the Four-Party Agreement, the Hague memorandum, the Hydrocarbon Synthesis Agreement, and, with exceptions not material here, all arrangements between I.G. and the Jersey group. It enjoined the there defendants from further performance of these agreements and from accounting to I.G. in respect to receipts from the subject matter covered by any of the agreements. Further the decree ordered the there defendants to transfer certain patents in suit here to S.I.G. and Jasco, which were to issue licenses indiscriminately. In the decree, the Alien Property Custodian consented to execute further transfers of property necessary to carry out the provisions of the decree. The decree also contained declarations that it left undisturbed property rights of the defendants and property rights of the Custodian unaffected by the terms of the decree.

In 1944, plaintiffs commenced this action under § 9(a) of the Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 9(a), to recover their alleged property. The case was heard in 1945 and 1946 by Judge Wyzanski, sitting by designation; and his final decree in the action was entered July 6, 1946. Under it the Jersey group recovered the seized S.I.G. stock; the legal title to the seized Jasco stock, subject to the duty to reconvey it to the Custodian upon payment of a $4,000 lien; 255 shares of USAC stock; the legal title to and certain equitable interests in the Class A S.I.G. patents; certain equitable interests in the Class B S.I.G., Oppanol, and certain other patents; and limited licensing powers in the Jasco

patents. The plaintiffs' appeal is based on the ground that they recovered too little, while defendant appeals because the plaintiffs recovered too much.

3. *The District Court's Findings.* The most crucial issues in the case, as the District Court viewed them, turned upon findings as to the intentions and acts of the parties; and, as we shall develop below, we entirely agree with this conception. Our disposition of the various legal issues is such that the final result—in its broadest and more important aspects—must stand or fall as those findings are upheld. The District Court found that of the transactions detailed above between I.G. and the Jersey group, all taking place before the Hague Conference were had in good faith. The formal legal interests apparently created by the documents were intended by the parties as substantial ones. Nor did the parties contemplate any substantial readjustment after the war except in the regular course of normal business transactions.

The court found in effect, however, that the agreements reached at the Hague Conference, the contemporaneous agreement for the transfer of USAC stock, and the steps taken to implement them made no substantial change in the relative property interests of the parties. The court found that these were sham transactions designed to create an appearance of Jersey ownership of property interests which nevertheless continued to be regarded by the parties as I.G. owned. The parties intended that after the completion of the war and the resulting disappearance of the danger of United States Government controls the properties would be formally returned to I.G. and the prewar relationship resumed.

Like other findings of the District Court, this crucial finding of the intent and purpose of these transactions is supported by fully adequate evidence, and, being far from "clearly erroneous," will be accepted by us. Rule 52(a), Federal Rules Civil Procedure, 28 U.S.C.A. following section 723c; Brassert v. Clark, 2 Cir., 162 F.2d 967. The plaintiffs attack it with the utmost vigor, asserting first that it is only a conclusion. While we think it is more basic than that, it is not very important how we characterize it, for we agree with the careful and thorough analysis made by the court. As a matter of fact the district judge took pains to buttress his decision on this point by a very detailed exposition of his grounds. Realizing that secret agreements of the kind involved would not be disclosed by direct evidence or confessions, he set forth the factors which led him to deduce the real understanding of the parties. Thus, first there was much attempted concealment at the Hague Conference. The text of the memorandum on Jasco reached at The Hague contained false representations of a type likely to mislead public authorities. It represented that Jasco, a corporation which was soon to be apparently American owned, had much greater rights in patents than it actually had. Moreover, the memorandum itself was incomplete, making no reference to obligations assumed by the Jersey group with regard to licenses of Jasco patents outside the Jasco field and with regard to distribution of Oppanol revenues. Further, Howard, the representative of the Jersey group, contrary to his usual practice, sent only incomplete written reports of the conference to his superiors and the personal notes he retained were unusually sketchy. On the witness stand, Howard, testifying concerning the Hague Conference, was, in the opinion of the court, not a credible witness. In view of the plaintiffs' necessary reliance upon Howard's testimony, without which their case could not stand, this attitude of the court who heard him was itself decisive.

Second, I.G. took action with respect to S.I.G. patents contrary to its natural and probable course if genuine changes in rights were intended by the parties. In the Four-Party Agreement of 1929 a sharp distinction was drawn between situations in which S.I.G. had title and those in which S.I.G. had only an exclusive license. Evidently the parties, or at least I.G., thought such a distinction important. Yet at The Hague it was made to appear that I.G. had made without compensation permanent assignments of patents it was not obliged to assign.

Third, sweeping financial readjustments were made with respect to Jasco without the usual careful consideration of results

by the parties. There was no showing made at the Hague Conference or at the trial that the division of revenues under the territorial division of Jasco rights adopted at The Hague corresponded to the division of revenues under the original Jasco Agreement or the Oppanol Agreement. Such absence of financial estimates indicated to the district judge an arbitrariness designed to be temporary. The arbitrariness was further shown by the fact that when the parties discovered that Iraq was not at war with Germany, Iraq was transferred from Development's territory to I. G.'s. The net consequence was that the rich financial returns to I.G. of earlier transactions were not in evidence and were presumably nonexistent.

Fourth, the Hague negotiators gave careful consideration to the possibility of future changes in their decisions and wrote specific provisions concerning such changes into the agreement they reached on Jasco. Concerning the territorial arrangement, Dr. Ringer reported to his superiors that he had made it clear to Howard that I.G. insisted that the financial benefits of both parties from Jasco should not be changed by the readjustment. He further reported that Howard had rejected a proposal for a rendering of annual accounts and settlement of excess amounts by the parties as capable of being too easily seen through. Then, his report continued, the readjustment proposal was drawn so that a revision of the division of countries should take place if the financial results for either party, measured by the terms of the Jasco Agreement, should not be adequate. At the trial Howard did not at first recall that a proposal for such territorial revision had been made at the Hague Conference. Later he did recall it. The parties regarded the Hague memorandum itself as ambiguous on the question whether or not a right to the same division of revenues as under the original Jasco Agreement could be legally enforced. In a report to another official of Jersey, Howard recognized the "possibility of legally enforcing the re-adjustment provision" finally written into the Hague Jasco Agreement. In his testimony he took inconsistent positions, finally agree-

ing that the financial intentions of the original Jasco Agreement should govern.

This does not complete the statement of all the factors listed by the judge to support his finding of the sham nature of the Hague agreements; but for purposes of review it sufficiently indicates the nature of the case as developed before him. It should be added that there were also other factors tending the same way which he either expressly ignored or did not emphasize. Of the former kind were reports made to their superiors by the I.G. representatives and discovered by the military authorities after the war. These were not considered because plaintiffs had not seen them; but at least an argument could be made that they were admissible as the statements of coconspirators, under the theory of cases such as United States v. Manton, 2 Cir., 107 F.2d 834, 839, certiorari denied Manton v. United States, 309 U.S. 664, 60 S.Ct. 596, 84 L.Ed. 1012. Of the latter were other known instances of practical deception by Jersey as to the legal devices actually employed, such as concealment from English interests, at the onset of war, of Jersey's German connections, or like concealment from Jersey's co-operating domestic companies through conveyances made to the Jersey trustees—the latter with I.G.'s thorough cooperation, even to the extent of re-execution of its assignments to conform to this plan. In other words, the judge took pains to confine himself to evidence he considered unchallengeable. Though plaintiffs separately and specifically attack each of the factors stated by the court, we are not persuaded of any substantial or pervasive error in the court's processes or deductions. Moreover, it is the over-all deduction which must be upset; and this, we think, was wholly rational under the circumstances. Here we have two great industrial organizations which had shown their ability over many years to act in perfect co-operation with flexible legal devices adapted to changing industrial or political circumstances; a pressing and portentous need to make adjustments against the impending crisis foreshadowed by the war; and a formal adjustment of relations, with various unusual qualities, including disposi-

tion of rights by I.G. with small or indirect financial returns (quite contrary to previous habits and customs) and with concealment and furtiveness apparent. Indeed we think this major adjudication below was quite just.

4. *Plaintiffs' Right to Sue.* As American corporations, the plaintiffs' right to bring suit to recover their property from the Custodian is, on its face, within the specific authorization of § 9(a) of the Trading with the Enemy Act, 50 U.S.C.A. Appendix, § 9(a). Nevertheless, a question as to that right arises in view of the 1941 amendment to § 5(b) of the Act, 50 U.S.C.A.Appendix, § 5(b). Previous to the amendment, § 7(c) of the Act, 50 U.S. C.A.Appendix, § 7(c), had authorized the vesting of property owned or held on behalf of enemy nationals; the 1941 amendment to § 5(b) authorizes the vesting of property of all foreign nationals whether enemy or not. Defendant claims that this amendment by necessary implication destroyed the right granted by § 9(a) to nationals of friendly foreign powers to sue to recover seized property. If this were so, the plaintiffs' right to proceed here might be brought into direct question because of Exec. Order 8785, § 5, subd. E (iii), 12 U.S.C.A. § 95a note, 3 CFR, Cum. Supp., 948, 6 F.R. 2897. That order, for some purposes under the Trading with the Enemy Act, includes in the definition of foreign nationals any persons to the extent that they acted directly or indirectly for the benefit, or on behalf, of a foreign national.[1]

Thus there are two steps to the argument before its conclusion is reached. Taking these up in order, it is clear that there is an ambiguity in the Act which must be— and apparently soon will be—resolved by the Supreme Court. In Uebersee Finanz-Korporation, A.G., v. Markham, 81 U.S. App.D.C. 284, 158 F.2d 313, the court, one

justice dissenting, reversed the decision of the district court in favor of the Custodian, to uphold the right to sue. On grant of certiorari, the case was argued in the Supreme Court in May, but has now been restored to the docket for reargument in the fall. Clark v. Uebersee Finanz-Korporation, A.G., 67 S.Ct. 1749. A like order for reargument was made in the companion case of Silesian American Corp. v. Clark, 67 S.Ct. 1748, on review of our decision in Silesian American Corp. v. Markham, 2 Cir., 156 F.2d 793.[2] The parties have furnished us with the briefs on the issue as presented to the Supreme Court, and these have been helpful.

The opposing points of view are stated in the two opinions of the Court of Appeals in the Uebersee case. The plaintiffs' point of view is that the amended § 5(b) is not to be treated as an amendment by implication of § 9(a), but that the statutes must be read together and each given effect. So considered, the effect of the change in law is to enable the government to meet the real evil of the cloaking of enemy property interests by apparent holdings by nationals of friendly powers. Seizure is permitted against such nationals, who can then secure a return only upon showing that the property is genuinely their own. While their suits were pending, title to the vested property would be prima facie in the Custodian, pursuant to § 5(b). Limitation of the amendment thus to procedure is urged as a natural interpretation, particularly in view of the constitutional difficulties attendant upon an interpretation that the amendment took away the right of nationals of friendly foreign powers to sue. By § 7(c), the remedy of claimants under the Act is made exclusive; and hence the amendment if thus interpreted would be subject to attack as confiscatory. Moreover, the Custodian has failed to secure such legislation from Congress; in-

---

[1] Though defendant does not make the argument, it would seem possible to contend that, under this extensive definition, plaintiffs became enemy nationals after the outbreak of war, since their concealment of I.G. assets continued thereafter. Such an argument would not require restricting the scope of § 9(a).

[2] Notwithstanding some interpretation of this case as full support for the Custodian's position, cf. 56 Yale L.J. 1038, it does not go so far; for only at issue was the question whether a claimant had some remedy in some court, thus making unjustified the refusal of a corporation to transfer stock on its books to the Custodian.

deed the Senate in 1946 struck out a provision from a pending bill in order "to eliminate the proposal to cut off the right of a friendly foreign national to sue for and obtain the return of his property under Section 9(a)," Sen. Rep. No. 1839, 79th Cong., 2d Sess., and the bill as thus amended became law on August 8, 1946. 60 Stat. 925, 50 U.S.C.A.Appendix, § 33.

Defendant, however, contends that this is too limited effect to give to an important amendment, granting the President power to vest such property in an agency or person, and "upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States." He says that there are no constitutional difficulties, because a claimant of a friendly nation has a right to recover just compensation in the Court of Claims for any property taken, that the restriction of remedies by § 7(c) is only of those for return of the "property," not of compensation for its use, and that his administration of enemy assets will be vastly hampered if he cannot sell or otherwise make use thereof until it has been determined that no part is to be returned to nationals of friendly countries.

Were we forced to a final decision at this time, we should be content to accept the precedent of the decision in the Court of Appeals on the grounds ably stated by Chief Justice Groner. The power of seizure and confiscation, particularly as against a friendly alien, is so drastic and so novel that we think it should not be extended beyond bounds clearly set. The concession of a remedy in the Court of Claims tends to support this view. While the practical advantages to the Custodian of the restricted remedy are obvious, yet it hardly seems that Congress would have taken an apparently drastic step in international law only to achieve indirectly this merely procedural change. Cf. 56 Yale L.J. 1068.

■ But even if the defendant's general position be accepted, we think the second step of the argument presents difficulty in application beyond the general terms of the decree below. This premise would afford an added ground, a further buttress, for the refusal to return the property found below to be substantially and equitably that of I.G. But we do not see how it assists the defendant beyond this. Under the Executive definition of a foreign national, so far as here pertinent, it includes other persons only "to the extent" that they acted directly or indirectly for the benefit or on behalf of a foreign national. Where plaintiffs were acting for themselves, as the District Court found with respect to the purchases before 1939, we find nothing in these provisions to bar the plaintiffs from suit. Accordingly we conclude that application of the asserted principle would not change the final outcome of this action.

■ 5. *Unclean Hands and Antitrust Violations.* Defendant also urges that plaintiffs must fail generally because they do not come into court with clean hands in an action which is, by the terms of § 9(a), of the type formerly denominated equitable. Cummings v. Deutsche Bank und Disconto-Gesellschaft, 300 U.S. 115, 118, 57 S.Ct. 359, 81 L.Ed. 545. Plaintiffs' hands are unclean, says defendant, because of misrepresentations by Jersey of the actual relationships between it and I.G. and because the I.G.-Jersey arrangements were declared by the consent decree to be violative of the antitrust laws.

■ If plaintiffs were seeking enforcement of obligations arising under an illegal arrangement, a court would not lend them its aid. Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165. Here, however, they are seeking return of property owned by them. This right is specifically written into a statute providing for government seizure of property. Nowhere in the statute is there written any restriction of the right to the return of property or any enlargement of the Government's power of seizure because of violation of law in the claimant's original acquisition of it. Moreover, no cases on patent infringements where the defense of unclean hands based on the antitrust law has been sanctioned go so far. Morton-Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L. Ed. 363, denied a remedy for infringement

to a patentee using his patent for unlawful restraint of trade. See also Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S. Ct. 993, 89 L.Ed. 1381. In no case has title to patents been denied because of violation of the antitrust laws. Indeed, in Hartford-Empire Co. v. United States, 323 U.S. 386, 413, 414, 65 S.Ct. 373, 89 L.Ed. 322, supplemented 324 U.S. 570, 65 S.Ct. 815, 89 L. Ed. 1198, the Supreme Court reversed as confiscatory portions of a decree requiring compulsory licensing of patents by certain violators of the antitrust laws. "Equity does not demand that its suitors shall have led blameless lives." Loughran v. Loughran, 292 U.S. 216, 229, 54 S.Ct. 684, 689, 78 L.Ed. 1219.

Moreover, since the consent decree the property in suit has not been used in violation of the antitrust laws. As the Court pointed out in the Hartford-Empire case, supra, 323 U.S. 386, 415, 416, 65 S.Ct. 373, 89 L.Ed. 322, the doctrine of the Morton Salt case applied so long as the patentee uses his patent to violate the law. These plaintiffs have paid once, in the consent decree, for their wrongdoing and should not be made to pay again for those same acts. We do not believe the taint of illegality clings to property as long as it is in the hands of the illegal acquirer so that he may never restrain or redress its wrongful seizure.

We now pass to the specific claims in issue.

■ 6. *The S.I.G. Stock*. The District Court properly awarded the seized 200 shares of S.I.G. stock to plaintiff Standard. The stock was originally issued to I.G. for $20,000 in 1929, and it was repurchased by Standard in 1939 for the same amount. Although the funds passing through S.I.G.'s hands amounted to many times its capital stock account, this money was almost wholly paid out in dividends. S.I.G.'s actual profits were limited to $11,000 per year, and the dividends on 200 shares were therefore limited to $2,200 per year. The price paid for the stock by Standard therefore does not seem unfair. Since the court found the transaction to be one designed in good faith to pass title to Standard, the stock belonged to Standard when vested and Standard is entitled to recover it.

■ 7. *The USAC Stock*. The Custodian vested in himself title to 425 shares of USAC stock. This represented one-half the 850 shares originally registered in the name of S.I.G. as agent for I.G. and the Jersey interests. The District Court ruled that Development was entitled to the return of 255 shares of this stock, and with this ruling we agree. When the stock was originally issued to S.I.G. in 1938, I.G. and Standard had agreed between themselves that I.G. was the beneficial owner of $\frac{1}{5}$ of the shares, and the Jersey interests beneficial owner of $\frac{4}{5}$. S.I.G. had only a bare legal title to the stock. One-fifth of the purchase price, $17,000, was charged against I.G.; the remainder, $68,000, was charged against the Jersey group. The court found that all the 1939 maneuvers with regard to USAC were not intended to change the substantial ownership of the stock. I.G.'s interest at the time of the vesting orders was therefore 170 shares; the remainder belongs to Development, in whose name the Jersey participation was held.

■ 8. *The Jasco Stock*. The District Court found that the "purchase" by plaintiffs in 1939 of the 5 shares of Jasco stock owned by I.G. was not intended to affect I.G.'s postwar ownership of the stock. It concluded therefore that defendant had properly vested the stock and was entitled to it, subject to a lien of $4,000 in favor of plaintiffs. To acquire possession of the stock, Development paid $146,000 to a bank with whom I.G. had pledged it. This money it charged off against I.G.'s account. Development also paid $4,000 to a Dr. Duisberg, son of one of I.G.'s founders, who was contemporaneously described by Teagle, then chairman of Standard's Board of Directors, as "I.G.'s sole representative in this country." This payment was never charged against I.G.'s account; since it was in amount equal to the original issuing price of the stock, it was probably intended to represent the purchase price. On these facts the District Court came to the legal conclusion that Development should retain an agent's lien for its expenditures. With

this conclusion we disagree. I.G. was considered by the parties as the owner of the stock before, as well as after, the transaction, and the $4,000 was not spent on I.G.'s behalf. Had it been so spent, it, like the pledge liquidation payment, would have been charged off against I.G.'s account. Moreover, it was not paid to an independent third party. It was paid to Duisberg to reimburse him for what only a few days before he had paid I.G. for his "claim" to the stock. It is apparent that Duisberg was not speculating in Jasco stock, for he bought stock encumbered by a pledge of about thirty-five times its purchase price and sold it for what he had paid for it only a few days later. It is also apparent that he "purchased" and "sold" the stock at I.G.'s dictation. In view of these facts and of his agency and blood relationship to I.G. and its officers, the inference is inescapable that Duisberg was just another dummy used to hide the real ownership of I.G. property. Development's "agency" was therefore one to buy the stock for I. G. from I.G. itself. This was therefore a purely formal, not an actual, transaction. Even in its formal aspects, Development was more a purchaser than the seller's agent. Moreover, no lien was intended by the parties, and plaintiffs do not claim any in their briefs; the money advanced was just a step in misrepresenting the ownership of the stock. The most the Jersey group can have is a claim for money paid to the use of another, which cannot be enforced against this defendant or in this proceeding.

■■■■■ A further question arises as to whether or not the consent decree has settled this issue against the defendant. In one section, entitled "Definitions," of this lengthy document it defined Jasco as a corporation of a certain state and place, "all of the capital stock of which is now owned by Development, which controls the corporation." This statement was not res judicata on, or even a determination of, the ownership of the Jasco stock. It was obviously intended only as part of an identifying label. A judgment "does not reside in its recitals, but in the mandatory portions." Eckerson v. Tanney, D.C.S.D.N.Y., 235 F. 415, 418, affirmed 2 Cir., 243 F. 1007. As a matter of fact, the consent decree does not concern any of the questions as to the ownership of stock. Nowhere do its terms purport to make changes in stockholdings. On the contrary, it expressly disclaims intention to affect any right, title, or interest of the present plaintiffs in shares of stock; and it reserves as against the present plaintiffs all the Custodian's rights in any property not affected by its terms. The District Court was therefore correct in regarding the parties not bound by it. Cf. The Evergreens v. Nunan, 2 Cir., 141 F.2d 927, 152 A.L.R. 1187, certiorari denied 323 U.S. 720, 65 S.Ct. 49, 89 L.Ed. 579.

9. *The S.I.G. Patents.* Before the District Court, plaintiffs claimed that they were entitled to complete ownership of the S.I.G. patents, the subject of disposition in the Four-Party Agreement. Under that agreement, S.I.G. was set up to exploit certain patents on behalf of I.G. and the Jersey group, but was prohibited from engaging in any business save that of granting licenses under or transferring interests in patents within the hydrocarbon field. Further, it was prohibited by its charter from engaging in manufacturing operations. This prohibition could be removed only by holders of 85 per cent of the stock. Eighty per cent of S.I.G.'s stock was issued to Jersey; 20 per cent to I.G. Under Article II-A of the Four-Party Agreement, I.G. assigned and agreed to assign to S.I.G. all of its patent rights outside Germany which related wholly or principally to the hydrocarbon field. The assignment was made subject to the reservation by I.G. for the life of the patents of an exclusive royalty-free license and right to license others for all purposes outside the hydrocarbon field. A schedule of patents assigned under this provision was annexed to the agreement, but it was recited that the omission from the schedule of specific patents falling within the terms of the assignment did not exclude them from the operation of the assignment. The patents covered by this provision are those denominated Class A S.I.G. patents.

Article II-B dealt with I.G.'s patent rights outside Germany which were useful in the hydrocarbon field, but also useful to a substantial degree in other fields. Under these

patents I.G. granted and agreed to grant to S.I.G. for the life of the patents an exclusive royalty-free license and right to license others, but only so far as useful in the hydrocarbon field. A schedule of patents, qualified as in Article II-A, accompanied the grant. The patents covered by this provision are those denominated Class B S.I.G. patents.

Articles IV-A and IV-B provided that proceeds realized by S.I.G. be distributed in the following amounts and order: to I.G. roughly 20 per cent; to S.I.G. its expenses; to S.I.G. $11,000 per year; and the remainder to a named member of the Jersey group. Article XVII made the agreement terminable after eighteen years by two years' written notice by either party. It also provided that on termination all patent rights or licenses, with certain exceptions, should be retained by the parties then holding them, but that no party should be bound to give any technical information with regard to such surviving patent rights. The provisions of other articles of the agreement are not material to the issues in the present case.

The hydrocarbon field, which roughly embraced the oil and natural gas industries, was the field in which the Jersey group's far-flung empire principally operated. Chemical fields akin to and often overlapping the hydrocarbon field were the preserve in which the bulk of the similarly far-flung I.G. empire operated. By this agreement the parties divided between themselves the beneficial rights of ownership outside Germany of I.G.'s patents which related to both their fields. Subject to I.G. participation in S.I.G.'s revenues, the Jersey group was to enjoy the fruits of ownership of both classes of patents in so far as they pertained to the hydrocarbon field; I.G. was to enjoy those fruits outside the hydrocarbon field.

I.G. received in part from the bargain approximately $35,000,000 worth of Standard stock, plus approximately $275,000 in accrued dividends; a 20 per cent share in S.I.G.'s royalties; and an operative recognition (in another closely tied-in agreement between the two parties, known as the Division of Fields Agreement) of I.G.'s preferred position over the Jersey group in the chemical industry. The Jersey group obtained for itself control (outside Germany) in its operational field of I.G.'s patents and technology which were far ahead of its own and which, if used against it, might have caused it serious economic difficulties. By granting the 20 per cent interest in S.I.G.'s proceeds it assured itself of I.G.'s continued co-operation and interest in the development of its business.

Subsequent to the signing of the Four-Party Agreement, I.G. made to Standard a general assignment of the scheduled Class A patents, and later made to S.I.G. a large number of separate assignments of specific patents and patent applications on the A schedule.

On these facts the District Court ruled that I.G. had surrendered to S.I.G. the legal title to those Class A patents either generally or specifically assigned prior to September, 1939. (Assignments after that date were, of course, part of the general scheme of false title-shifting of the Hague Conference.) As to the other Class A patents and patent applications, the court ruled that title remained in I.G., but that S.I.G. had a right in equity to require I.G. to convey title. The court ruled that I.G. had not surrendered title to the Class B S.I.G. patents, but that S.I.G. had certain equitable interests in licensing, royalties, and other rights under them.

If the problem must be visualized in terms of title as a unit, there are various precedents cited by the District Court which tend to support its view. Littlefield v. Perry, 88 U.S. 205, 219, 222, 21 Wall. 205, 22 L.Ed. 577; Waterman v. Mackenzie, 138 U.S. 252, 261, 11 S.Ct. 334, 34 L.Ed. 923; General Aniline & Film Corp. v. C.I.R., 2 Cir., 139 F.2d 759, 760; McDuffee v. Hestonville, M. & F. Pass. R. Co., 3 Cir., 162 F. 36, 38, 39; Universal Oil Products Co. v. Root Refining Co., D.C.Del., 16 F.Supp. 846, affirmed Root Refining Co. v. Universal Oil Products Co., 3 Cir., 93 F.2d 186; contra, Six Wheel Corp. v. Sterling Motor Truck Co. of California, 9 Cir., 50 F.2d 568. But we do not feel that it must be so regarded. The important question is whether the interests of plaintiffs are property interests of sufficient substance that plaintiffs may recover them from the Alien

Property Custodian against the latter's contention that they are merely "executory contracts." To classify plaintiffs' or defendant's interests here under one or more of the categories of "title," "equitable servitude in property," or "contractual right" does not settle the problem. The rights of both parties can be fitted into various of these categories. Indeed, the inveterate use of the labels "property" or "title" as group symbols, denoting a "bundle" of rights or other legal relations, is now well understood; it is only when we advance beyond these forms to the questions of degree, or of number and value of such rights, that we come to a solution of problems such as this. See 1 Restatement, Property, 1936, 3, 4, 10-12, 27-30; Hohfeld, Fundamental Legal Conceptions, 1923, 3, 12, 67 et seq.; 26 Yale L.J. 710, 712, 746; 28 Id. 721, 729; Rohmer v. C.I.R., 2 Cir., 153 F.2d 61, 64, certiorari denied 328 U.S. 862, 66 S.Ct. 1367, 90 L.Ed. 1632; Morris Plan Industrial Bank of New York v. Schorn, 2 Cir., 135 F.2d 538, 540; authorities cited in Clark, Real Covenants, 2d Ed. 1947, 4, 30, 156.

The rights to recover patent royalties, to license, and to transfer rights in a patent are some of the many elements of enjoyment making up title. The interests of both parties are in part at least of the type which a former court of equity would have enforced; and certainly some of the rights are contractual in origin and nature. In whatever category considered, however, the licensing rights would be protected against the holder of legal title to the patents or against third parties with notice, New York Phonograph Co. v. Edison, C.C.S.D.N.Y., 136 F. 600, 606, affirmed 2 Cir., 144 F. 404; Werderman v. Société Générale d'Electricité, 19 Ch.D. 246, or against the holder's trustee in bankruptcy. In re Waterson, Berlin & Snyder Co., 2 Cir., 48 F.2d 704. The patent rights divided into two parts by the Four-Party Agreement were those to a new expanding industrial technology; their value was very great; the Jersey group considered that the part it got was worth in excess of $35,000,-000, for that was the price it paid; we do not know what value I.G. set on the part it retained. We think that, because of their substantial nature and their great monetary value, the rights both obtained in the Four-Party Agreement are substantial enough to be regarded as some form of property interest, for which the plaintiffs may sue and have judgment in this action.

10. *Effect of the Consent Decree on the S.I.G. Patents.* When the consent decree was framed, S.I.G. had in the S.I.G. patents of both classes exclusive licensing and royalty rights in the hydrocarbon field outside Germany; I.G. had an exclusive license and licensing and royalty rights outside the hydrocarbon field. We need not here determine how great an abrogation of the rights of the Jersey group the United States might have secured by prosecuting its antitrust action against Jersey to a nonconsensual termination. For the United States instead accepted the consent decree as a final settlement of its grievances against these plaintiffs which arose from the Four-Party Agreement. Finality then would follow from the general principle that a consent decree is res judicata of the issues included. O'Cedar Corp. v. F. W. Woolworth Co., 7 Cir., 66 F.2d 363, certiorari denied Midway Chemical Co. v. O'Cedar Corp., 291 U.S. 666, 54 S.Ct. 441, 78 L.Ed. 1057; Pick Mfg. Co. v. General Motors Corporation, 7 Cir., 80 F.2d 639; General Elec. Co. v. Hygrade Sylvania Corp., D.C.S.D.N.Y., 61 F.Supp. 476, 491.

Moreover, finality as to this particular grievance was made more specific by the terms of the decree. In sec. VIII of the decree the right of the Department of Justice to take further action against these plaintiffs is reserved. But from this reservation, action based upon agreements specifically named in sec. III is excepted. The Four-Party Agreement is specifically named in sec III.

The Alien Property Custodian was one of those consenting to the decree, and he, like the other parties to it, is bound by its modification or nonmodification of property rights. Of course, if these plaintiffs, after the filing of the consent decree, had used their property interests to violate the antitrust laws, the decree could be modified to force the discontinuance of such action. United States v.

Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999; Coca-Cola Co. v. Standard Bottling Co., 10 Cir., 138 F.2d 788. But no claim of new violation is made as to the Four-Party Agreement. To the extent that it applies, therefore, the consent decree is determinative of the present status of the interests of the parties in the S.I.G. patents.

The specific provisions of the consent decree must be read in the light of its general purposes. These were to put an end to the co-operative restraint of trade practiced by I.G. and the Jersey group and to insure the licensing for all purposes and to all applicants of the patents controlled by these two. That substantially nothing more than this was intended is shown by the sweeping language of the clauses making explicit reservations which were incorporated into the decree. Protecting Jersey's rights, sec. VII provides in part: "Nothing contained in this decree shall affect or diminish any right, title or interest of the defendants, their successors, subsidiaries or assigns in or to or under any presently existing patents, licenses under such patents, patent applications, assignments of such patents or of such patent applications, trade marks, trade names, or shares of corporate stock." Protecting the Custodian's rights, sec. XII provides in part: "The consent of the Alien Property Custodian to the entry of this decree and this agreement to be bound, however, shall not affect such further rights of the Alien Property Custodian to any property or the proceeds thereof, or rights therein, as may remain unaffected by the terms of this decree, and all such right, title and interest of the Alien Property Custodian in any property or the proceeds thereof as between the Alien Property Custodian and any of the defendants is hereby expressly reserved."

Certain provisions of the decree have more or less specific reference to the Four-Party Agreement and the S.I.G. patents. Sec. IV(2) directs the there defendants to grant to S.I.G. all their right to, title to, power, and interest in both the Class A and Class B S.I.G. patents. Sec. V(5, 6, 7) directs licensing under these and the Jasco patents to all applicants and use of the pat-

ents free of royalties for the duration of the war emergency and subject to payment of a reasonable royalty thereafter.

Save as to the requirements for indiscriminate licensing, these provisions do not diminish S.I.G.'s previous rights in the S.I.G. patents. These S.I.G. is entitled to recover from the Custodian. Unless its rights were increased by the decree and the Custodian's decreased, S.I.G. is entitled to recover no more.

The District Court held that to a certain extent the Custodian's interests in S.I.G. patents were decreased by the consent decree. In the Class A patents the decrease amounted to virtual destruction of the Custodian's royalty and licensing rights. In the Class B S.I.G. patents, it was not so extensive. The District Court relied upon several sections of the decree as establishing this reduction. Sec. III declares the Four-Party Agreement and other agreements illegal and enjoins the there defendants from further performing any of the provisions of those agreements. Sec. IV (1) requires them to discontinue all existing relations with I.G., with certain exceptions immaterial here. Sec. V(3) enjoins them from accounting to I.G. in respect to receipts from the subject matter of any agreement declared illegal by the decree. Sec. XII recites the Alien Property Custodian's consent "to execute such further transfers of property to S.I.G. or Jasco as may be necessary to carry out the provisions of the decree, including the provisions of the decree limiting or prohibiting royalties under those patents and providing for compulsory licensing under them."

These provisions, considered against the background, purposes, and results of the decree, do not suggest the propriety of reducing the Custodian's interests in the S.I.G. patents. The injunctive provisions against accounting to I.G. and continuing the relationship with I.G. specifically mention I.G. by name. They do not purport to forbid relations with any governmental agency which succeeds to I.G.'s interests by seizure. So also the prohibition against Jersey's execution of the provisions of the Four-Party Agreement applicable between the parties to that agreement should not be

extended to the Custodian. While he is formally successor to I.G.'s rights, he is obviously in a different situation from the ordinary assignee for value; for he is the agent of a government seeking the destruction of I.G.'s power in America. Under those circumstances payments by Jersey to the Custodian are hardly fulfillment of an agreement calling for payments to I.G. Nor is the purpose of the decree subserved by a contrary holding. It was aimed at a situation in which the members of the Jersey group were wrongdoers, monopolistically restraining trade. The United States had instituted an action against them, but against the background of the war accepted a consent decree. It is not a permissible inference from these facts that the Government intended to donate to the Jersey group a very valuable group of licensing and royalty rights as virtually a reward for their wrongdoing.

Such an inference is further negatived by other factors. Negotiations leading to the decree were long and carefully conducted between representatives of the Anti-trust Division of the Department of Justice and counsel for these plaintiffs. But the Office of the Alien Property Custodian had been created in the Office for Emergency Management by Executive Order only two weeks before the filing of the decree. Exec. Order 9095, 3 CFR, Cum.Supp., 1121. Even if the negotiators for the Department of Justice knew of the impending creation of the Custodian's Office, they could not have known before its creation exactly what property the Custodian would purport to vest. The inartistic language used should not be interpreted as showing an intention to give away valuable property interests vested in the Custodian. Nor is it to be easily inferred that the court or the defendant's counsel were led so to understand. Since the Custodian was appointed so recently before the decree, he had a very small part, if any, in the negotiations and little opportunity to ascertain exactly what property interests he was to acquire by his vesting order. It is very questionable whether he understood such oblique provisions as secs. III, IV(1), and IV(3) as taking away from him what he had just seized. His participation in the decree was actually for quite a different purpose, as indeed the express reservation of his rights in sec. XII indicates. His appearance as successor to I.G. was necessary to provide a defense for the Jersey group against a possible later suit by I.G. in a foreign court for nonperformance of the agreements between the two. In the early part of 1942, action was quickly taken and documents hurriedly drafted. We should avoid drawing irrational conclusions from their sometimes unartful wording. We conclude therefore that the Custodian's interests in the S.I.G. patents were not diminished by the consent decree, and that the judgment in this action should be accordingly modified.

Acting upon the Custodian's agreement in sec. XII to execute further transfers of property, the District Court ordered the defendant to transfer certain interests in patents to S.I.G. and Jasco to carry out the purposes of the consent decree. The parties do not question the court's jurisdiction to order such transfers, and we think they were within its discretion. The purpose the District Court sought to effectuate was to make S.I.G. patent licenses freely obtainable for all purposes at one point from one licensor. Consistent with our conclusions as to the rights of the parties in S.I.G. patents, this purpose will be served by the grant to S.I.G. of only the Custodian's licensing power in the S.I.G. patents, to be exercised in conformity with the provisions of the consent decree. As modified in accordance with our views, the decree will give to S.I.G. the exclusive right and duty to grant licenses under the S.I.G. patents to all applicants upon reasonable royalties. In so far as licenses are granted for use in the hydrocarbon field, S.I.G. shall pay over to the Custodian that portion of the royalty receipts which it would have been obliged to pay to I.G. under the terms of the Four-Party Agreement. Licenses for use outside the hydrocarbon field will be granted by S.I.G. only upon terms directed by the Custodian, and S.I.G. will account to the Custodian for all receipts on such licenses, less actual licensing expenses. The accounting provision of the decree as modified does no violence to the purpose of the

consent decree, for it does not limit in any way the availability of the patents for licensing in all fields.

**11. The Jasco Process Patents.** Plaintiffs claim interests in patents for processes within the so-called Jasco field. Jasco, a corporation in which I.G. and Development each held 50 per cent of the stock, came into existence in 1930 under the terms of the Jasco Agreement. Under the agreement the Jasco corporation was formed to develop and exploit new processes of both parties, employing as starting material crude petroleum, natural bitumen, or natural gas.

Article II of that agreement provided that, when either party developed a new chemical process within the field, it should give the other party four months in which to elect whether or not the process should be developed by Jasco. Article III provided that, where Jasco had developed a process to the point of commercial exploitation, the originating company, after preliminary agreement had been reached regarding that process, should give Jasco exclusive licenses and licensing rights outside Germany. Article III provided, however, that, as a condition precedent to the grant of exclusive licensing rights to Jasco, agreement between the parties on five points was required. These included definition of the process, marketing arrangements, the amount of royalty due the originating party, which party was to control future management of the process, and disposition of existing contractual obligations of either party bearing on the process. Article VII provided that the parties should try to come to agreement, and that in case of failure of agreement the decision should rest with the party which would have been entitled to control of the process under the Division of Fields Agreement.

The District Court concluded, and we agree, that Jasco and the other plaintiffs here gained no interests in any patents solely by this agreement. With respect to patent rights, the only action the parties bound themselves to take was to negotiate. If the negotiations led to agreements granting rights to Jasco, the rights would be derived, as they were in the case of Op-

panol, from those agreements. If no agreements were reached, no rights would pass to Jasco.

After the signing of the agreement Jasco conducted substantial experimentation projects for I.G. and the Jersey group. I.G. submitted informally to Jasco for development the Acetylene Arc process, the Paraffin Oxidation process, the Oppanol process, and parts of the Buna process. Subsequently Jasco made contracts in respect to the Paraffin Oxidation process and certain parts of the Buna process with outside business firms. Nevertheless the District Court found, on sufficient evidence, that Jasco actually acquired no commercial rights in these two processes. In its contracts with outsiders it was dealing in what it might get from I.G. Nor did Jasco acquire any property interest in the Acetylene Arc process. The I.G.-originated patents involved in these three processes were completely owned by I.G. on the seizure date and therefore vested in the Custodian.

The consent decree did not substantially decrease the Custodian's interest in these patents, for the reasons set forth in the discussion of his rights under the S.I.G. patents. There is another reason also. Though some of the Custodian's rights in Class A S.I.G. patents might be regarded as derived from the Four-Party Agreement and hence subject to the legal infirmities of that document, the Custodian's rights in the Jasco processes are not derived from any illegal agreement. They are those which I.G. obtained directly or through its employees from the United States patent offices. Hence it cannot be persuasively argued that the consent decree limits these rights because of illegality of their source.

To carry out this licensing purpose of the consent decree, Jasco was given a bare right to license patents in these processes for the Custodian's account. Apparently this right has never been disturbed, as the court below decided. We agree with the District Court that Jasco is entitled to enjoy this right.

**12. The Oppanol and Allied Process Patents.** Oppanol was the one Jasco process concerning which a formal agreement was reached by I.G. and the Jersey

934

group. The Oppanol memorandum was signed in 1933. The District Court found that under its terms "it was provided that (1) 'Oppanol * * * outside of Germany be brought in Jasco,' (2) 'Standard' [by which is meant the corporation heretofore called 'Development'] was to have 'the control in commercial exploitation * * * in the oil industry, I.G. the control so far as other uses are concerned,' (3) [Standard Oil Company of] 'New Jersey' 'to use the patents in question without compensation for Jasco, but only for the own use of Jersey in the oil industry,' and (4) instead of dividing the revenues from the licensing by Jasco of the Oppanol patents in the proportion of ⅝ to I.G. and ⅜ to Development as provided in the Jasco Agreement, the Oppanol revenues were subjected to a special scheme whereby (a) the royalties received by Jasco from licensing Oppanol were to be distributed ½ to I.G. and ½ to Development and (b) the royalties to be paid by Development were to go not to Jasco but to S.I.G. so that ultimately ⅙ would be distributed to I.G. and approximately ⅘ to assignees of Delaware."

Under these terms both I.G. and the Jersey group secured substantial interests in patents under this process. Pursuant to the consent decree, all the rights of the plaintiffs in the Oppanol patents were transferred to Jasco. Jasco is now entitled to recover licensing and royalty rights in the Oppanol patents, as granted in the Oppanol memorandum. We are content to leave these interests as they were left by the District Court.

█ 13. *The Jersey-Originated Jasco Patents.* Under the consent decree certain Jersey-originated patents under the four so-called Jasco processes and other processes have been transferred to Jasco. With the exception of those under the Oppanol process, I.G. never owned or possessed rights in these patents prior to the consent decree. Plaintiffs urge that it is therefore inequitable that these rights be transferred to the Custodian, who, they say, is entitled only to what I.G. had. As we have seen, the consent decree contained a recitation that the Jasco stock was completely owned

by Jersey interests. It was on this assumption that the court signed, and counsel for the United States approved, the decree providing for a transfer of various of the interests of the Jersey group to Jasco. The plaintiffs now urge that, since the court issuing the consent decree was in error as to the ownership of Jasco stock, the District Court in this suit should have required reconveyance of the rights in Jersey-originated patents to Development, which is a wholly owned subsidiary of Standard. They therefore name this an unwarranted "windfall" to the Custodian.

The decree below dismisses the complaint for the recovery of these patents "for lack of jurisdiction." But the broad provisions of § 9(a) of the Act authorize a "suit in equity" for "any interest" in money or other property "conveyed, transferred, assigned, delivered, or paid" to the Custodian wherein the court may order the transfer to a claimant of "the interest therein to which the court shall determine said claimant is entitled." This is surely sufficient authority to cover the adjustment of these rights between the parties properly before the court. The District Court seems, however, to have rested its refusal to act upon some feeling of comity or unwillingness to interfere with the acts of the court which had entered the consent decree. This, we think, was undue concern; it was familiar with all details of this complicated question, which had never been before the court in New Jersey in its present and true setting. It was the court properly fitted to make the decision.

Nevertheless, on the merits, we feel that plaintiffs are not, in equity and good conscience, entitled to such relief. The provisions requiring the transfer of the rights in question to a corporation only half owned by Jersey were not the product of an error, so far as these plaintiffs were concerned. On their part it was a misrepresentation, part of their scheme to deceive their government. Plaintiffs had already represented falsely that Jasco had valuable rights in patents covering the Buna, Acetylene Arc, and Paraffin Oxidation processes. By this misrepresentation they sought to wrest from the Custodian a part of the

complete ownership of these processes which the Custodian had properly secured by seizure from I.G. But they were not content with wrongfully obtaining part of the rights; they wanted all. So they misrepresented that all of Jasco's stock was owned by them, and thus eliminated—until discovery—the half ownership by vesting of the United States in Jasco. By coupling these misrepresentations with sec. III of the consent decree enjoining the performance of agreements with I.G., plaintiffs thought they had successfully destroyed all the Custodian's rights in these processes. Moreover the misrepresentation of Jasco's stock ownership was not wrongful only as to the consent decree. It was a violation of Jersey's statutory obligation under § 7(a) of the Trading with the Enemy Act and an Executive Order, Exec.Order 8785, June 14, 1941, 12 U.S.C.A. § 95a note, 3 CFR, Cum.Supp., 948, 6 F.R. 2897, and a Treasury Regulation, § 130.4, 31 CFR, Cum. Supp., 8817, 8818, 6 F.R. 2905, to report the foreign-owned stock in Jasco.[3]

True, the consent decree was arranged by eminent counsel; and any charge of misrepresentation on their part is expressly disclaimed by the defendant. But after all, it is the principals who are involved and whose wrongdoing concerns us. Now that their deception has been found out, they appeal to the conscience of a court to free them from the pitfalls created by that deception. On this particular point we think the defense of unclean hands is well taken. It goes not to general conduct of the plaintiffs, but to their actions with regard to the very issue. This misconduct of the plaintiffs was not wiped out, as their previous misconduct was, by the acceptance by the United States of the consent decree. It prevailed throughout the procurement of the consent decree, and its temporary success is written into the recitals of the decree itself. Their wrongdoing is there-fore not cured by the Government's acceptance of the consent decree. This is not a case of affirmative penalties visited upon them for their acts; rather it is leaving them in the situation which they themselves have created. As we leave Jasco with the licensing and royalty rights in the I.G.-originated patents, obtained by it under the consent decree, so also we should leave it with this property just as settled by plaintiffs' agreement and desires in that decree.

**14. *The Lauryl Amine and Other AD Patents.*** Under the decree below, S.I.G. recovered in eight patents and one application of the so-called AD class, including the Lauryl Amine patent, rights equivalent to those it recovered in the Class B S.I.G. patents. The court's findings of fact do not support this recovery, and indeed the evidence on the record does not warrant a finding justifying such a recovery. The court found that the parties customarily covered AD patents in separately negotiated agreements. It found also that it was a doubtful question whether Lauryl Amine, in particular, came within the Four-Party Agreement. If the AD patents had not been treated as special problems by I.G. and Jersey, they could properly have been treated by the court in the same manner as the S.I.G. patents. But since the parties understood that special agreements were required to transfer rights from I.G. to Jersey, Jersey had to show agreements specifically transferring rights if it was to recover any.

The only showing made as to seven of the patents and the application was that they were physically delivered to a trustee for the Jersey group, along with previously unassigned S.I.G. patents, as a result of the Hague Conference. But the District Court found in effect that this assignment did not create any new substantial rights in Jersey or enlarge any it already possessed.

[3] In fact, there seems good ground for the contention that this misrepresentation, legally considered, was yet more extensive. Specifically, under § 5, subd. E(ii), of Exec. Order 8785, supra, Jasco itself could be viewed as a foreign national, in view of the substantial ownership—much more than the 25% referred to later in the regulation—of its stock by an enemy. But the Custodian has not taken this position as to Jasco in his vesting order. Nor has his counsel done so in this case, either on this issue or on the right to sue—possibly because, inter alia, the substantial results of the action would apparently not be greatly, if at all, affected.

The assignments of Class A S.I.G. patents were effective against the Custodian, in the District Court's rationale, because Jersey already had an equitable right to such assignments. Otherwise the assignments would have been merely parts of the sham of The Hague. With regard to Lauryl Amine, the same assignment was shown, and also several drafts of an agreement which was to grant Development certain rights. But the court found that this agreement was never executed. This finding is supported by oral, as well as documentary, evidence. Therefore this agreement is not evidence that I.G. transferred rights in Lauryl Amine to the Jersey group. It does show that the parties thought formal agreement necessary to transfer rights to AD patents, and therefore strengthens the inference, which may be drawn from the nonproduction of agreements concerning the other seven patents, that no transfer of rights under them was contemplated. Consequently the decree must be modified to except recovery of these items.

■ 15. *The Motion to Reopen for Further Evidence.* Only one point remains for discussion. Plaintiffs urge that certain documents should have been received in evidence and considered in connection with the findings on the sham nature of the Hague transactions. These documents were discovered in I.G.'s files by United States Government agents after the war. The documents were delivered to defendant's counsel in the District Court and thereafter inspected by counsel for plaintiffs. After the close of the case in the District Court, plaintiffs sought to have them received in evidence; and in this they were unsuccessful. We think the receipt or rejection of these documents was within the court's jurisdiction, and that it did not abuse it. The documents offered could not have affected the court's findings on the Hague Conference. Moreover, because of the condition of Germany and of I.G., portions of I.G.'s records will be found from time to time in the future. Of course the case, as brought and pressed by plaintiffs, cannot be reopened upon the finding of each new document.

It therefore follows that upon the defendant's appeal the decree should be modified as follows: (1) Plaintiffs should have no recovery in the Jasco stock, i. e., no lien for $4,000 for the $4,000 paid for the Duisberg release; (2) plaintiffs' recovery in both the Class A and Class B S.I.G. patents should be limited to the licensing and royalty rights and accrued royalties attaching thereto of the scope indicated in this opinion, and no more; (3) plaintiffs should have no recovery in the Lauryl Amine and other AD patents. The decree should also be modified to recite that the claim for the Jersey-originated Jasco patents is dismissed on the merits, rather than for lack of jurisdiction. Plaintiffs' appeal is not sustained.

Decree modified and, as modified, affirmed. Costs in this court are awarded defendant.

FRANK, Circuit Judge (concurring).

Although the opinions of Judge Wyzanski are of unusual excellence, they leave for our consideration several complicated problems with which Judge Clark's opinion brilliantly deals. Nevertheless, as to several items, I think it well to make some further comments.

1. Since its last paragraph disposes of the matter, all else in point 4 of the majority opinion is dictum in which I do not join, especially because the issue there discussed was not orally argued before us and will soon be decided by the Supreme Court.

2. Point 5 discusses defendant's contention concerning the anti-trust laws as if that contention were confined to patents. I would add the following, lest our opinion be taken as rejecting it: Perhaps it is the rule, quite aside from any patent doctrine, that the return of property seized without lawful authority by any government officer will be judicially denied if the property upon its return would be used illegally.[1]

[1] Cf. Strong v. United States, 1 Cir., 46 F.2d 257, 261, 79 A.L.R. 150; Voorhies v. United States, 5 Cir., 299 F. 275, 277; United States v. O'Dowd, D.C., 273 F. 600, 602; United States v. Goodhues, D.C., 53 F.2d 696, 699–701; In re Fried, 2 Cir., 161 F.2d 453, 458; Gallagher v. United States, 2 Cir., 6 F. 2d 758, 759.

Perhaps, then, if it seemed highly probable that plaintiffs here, on return of any of the property, would employ it to violate the antitrust laws, judgment, on that sole ground, should be for defendant, with leave to renew the suit on proof that the threat of such illegal use had ceased. But we need not here consider that question, because the consent decree enjoins such use, and defendant does not suggest that plaintiffs have violated or contemplate violation of that decree.

3. The district judge held that S.I.G. obtained title to some of the Class A patents and the right in equity to require I.G. to convey title to the others. As· I read my colleagues' point 9, they, in effect, agree with that ruling. Elsewhere in their opinion, however, they seem to conclude that, because of the anti-trust consent decree, S.I.G. is entitled merely to grant licenses to others under those patents. Assuming that to be the result at which the majority opinion arrives, I concur in it. But I cannot go along with my colleagues' intimation, by way of dictum, that, had there been no consent decree, the trial judge's ruling would have been correct. I call it dictum because I think it is not a necessary step in arriving at our decision. And I regret that dictum, and will not join in it, because its apparent approval of the trial judge's ruling (i. e., that title passed) is, I believe, contrary to the precedents, and would have had the consequence, absent the consent decree, of giving S.I.G.

greater rights in these patents than, under the Four Party Agreement, it had before the seizure. To make that statement intelligible and to explain adequately my objection to my colleagues' dictum, I must state in detail the following record facts not fully stated by my colleagues and the legal effect of which, I think, they have overlooked.

Notwithstanding that, by Article II of the Four Party Agreement, I.G. "assigns and agrees to assign" the Class A patents, Article IV-A explicitly provides: "S.I.G. obligates itself for the period of this agreement *not to engage in any business save that of granting licenses* or transferring interests in patents rights coming within the hydrocarbon field and assigned to it under this agreement by Standard or I.G." [2] (This provision ties in with the provision of the corporate charter of S.I.G. which prohibits it from engaging in manufacturing operations; this charter provision could be amended only by holders of 85% of the. stock of S.I.G.; as I.G. held 20%, such an amendment required the consent of I.G.) Article V, as I read it, provides that any transfer of "interests" by S.I.G. is to be restricted to transfers to corporations which *"shall not be empowered to engage in manufacturing operations, and shall be obliged to conduct the licensing of the patent rights conveyed to them under conditions the same as those imposed upon S.I.G. under Article IV-A hereof."* [3]

---

[2] Emphasis added.
This Article also provides that the licenses should be granted by S. I. G. "only in consideration of substantial royalties payable to it and upon a fair, and as nearly as may be, a uniform basis. * * * "

[3] Emphasis added. Note the reference to Article IV-A as stating "conditions * * * imposed upon S. I. G."
It is suggested that Article V deals solely with patent rights for the hydrogenation process which, in Article I, is defined as a "specific class of processes lying within the hydrocarbon field." I think such an interpretation of Article V incorrect. It cites patent rights for this specific class merely by way of "example." A reading of Article V as a whole makes this apparent,

I think. Article V in its entirety is as follows:
"*Departures from Article III and IV.* Standard may refrain from making the assignment to S. I. G. as provided in Art. III and S. I. G. may depart from the proposed licensing plan of Art. IV so long as the result as far as the interests of I. G. are concerned, shall be the same as though the said assignment were made and the proposed plan followed and so long as the result contemplated by Arts. III and IV is effected. For example, S. I. G. may grant to another corporation for a consideration, the patent rights for the hydrogenation process in the United States, and to a third corporation, for a consideration, the patent rights for the hydrogenation process' outside of the United States. These co'

The "conditions * * * imposed by Article IV-A" upon S.I.G., I think, had this legal effect: If S.I.G. itself made or used or sold any of the patented products, then (if the pertinent Class A patent were valid), S.I.G. would not be immune—as it would have been if it had had title to that patent—from an adverse judgment in an in-

porations shall not be empowered to engage in manufacturing operations, and shall be obliged to conduct the licensing of the patent rights conveyed to them under conditions the same as those imposed upon S. I. G. under Art. IV-a hereof. S. I. G. shall not be obligated to account to I. G. for the considerations received for such grants but shall pay over the entire considerations so received to Standard Oil Company of New Jersey after deductions for its own account as provided in Art. IV-B, b & c. But S. I. G. shall be obligated to provide that I. G. receives an account of all royalty payments including cash, free shares or other consideration, received by said corporations from the licensees the compensation provided in Art. IV-A hereof to the same extent as if those licensees were licensed directly by S. I. G."

It is also suggested that Article IX authorizes S. I. G. to assign any of the patents outright to Standard or I. G. But Article IX relates solely to "patent rights hereafter purchased by Standard or I. G. from others," and not transferred to S. I. G. Article IX reads as follows:

"*Purchased Patent Rights.* All assignments and grants of patent rights which are herein made or agreed to be made by Standard or I. G. to S. I. G. are subject to the following provisions, in so far as they relate to patent rights hereafter purchased by Standard or I. G. from others: If such patent rights are offered for purchase to Standard or I. G. the one to which the offer is made shall, if the matter appears to be important to the other, and it shall be practicable to do so, seek the cooperation of the other in making such purchase, with such fair distribution of the total expense as may be then agreed upon. The refusal of the other to cooperate in and share the expense of any such acquisition shall release the acquired patent right in every way from the operation of this agreement, but the patent right may be brought under this agreement, to the extent that the acquiring party still holds the same, at any time upon payment by the other of its equitable share of the purchase price."

It is further suggested that Article XII authorizes S. I. G. to assign the Agreement itself. But that Article (which must be read in the light of the rest of the Agreement) is as follows:

"Assignment of Agreement. Any party may assign the whole or any part of the rights and benefits accruing to it under this agreement, with or without assignment of those obligations which are not personal and inseparable from the business of the respective parties. Any assignment of obligations by one party shall, however, not be effective as regards the responsibility of the assigning party to the parties in respect thereto."

Another such suggestion rests on Article XVII, which reads as follows:

"Duration of Agreement.

"A. This agreement shall be effective Nov. 9th, 1929, and shall remain in force until terminated by two years written notice served by any party upon the others but no such notice shall be served prior to December 31, 1945.

"B. All patent rights, including licenses (save those covered in paragraph D hereof), which are or may be assigned or granted by any party to another by or in accordance with this agreement shall continue to be held and enjoyed by the party so acquiring them until the expiration of the respective patents, even though this agreement shall have earlier terminated, but no party shall be obligated to give to any other any technical assistance or experience with relation to surviving patent rights after the expiration of this agreement.

"C. Neither Standard nor S. I. G. shall be obligated to make any payments to I. G. except as covered in paragraph D hereof, after the termination of this agreement, save for and on account of licensing revenue coming within this agreement and accruing before its termination, but I. G. shall continue to hold and enjoy its participation in any compensation paid for accruing before the termination of this agreement, even though such payment shall cover in part rights obtained by the licensee enduring beyond the term of this agreement.

"D. Excepted from the provisions of paragraphs B and C of this Article, shall be patent rights of I. G. relating to the hydrocarbon field but not to the hydrogenation process and acquired by I. G. subsequent to December 31, 1941. These excepted patent rights may, before the expiration of this agreement, be licensed by S. I. G. to others for the full term of the patents in question, but S. I. G. shall be obligated to account to I. G. as provided in Art. IV hereof in re-

fringement suit. S.I.G. acquired merely the right to license others.[4] It had no right to sell any of the patents outright, since any purchaser would likewise be confined to granting licenses; and (as the majority opinion shows) S.I.G. had no interest in the royalties beyond reimbursement of its expenses and $11,000 a year. Yet the decision of the district judge—that S.I.G. has full title to these patents—would confer upon it an immunity from judgments of infringement and would empower it to sell the patents free of all restrictions, despite the explicit contrary provisions of the Four Party Agreement.

The legal effect of these restrictive provisions is not discussed by my colleagues. And I consider most unfortunate their dictum, as it may mislead the district court in this case and as it disregards the precedents —including our own recent decision in Rohmer v. Commissioner, 2 Cir., 153 F.2d 61, 63, 64. There we held that the crucial question in this type of case is whether the patent-owner has parted with "substantially less than the entire 'bundle of rights' "; we made clear that, when substantially less is transferred, the amount of consideration paid is irrelevant; there, too, we explained and qualified our previous general statements in General Aniline & Film Corp. v. Commissioner, 2 Cir., 139 F.2d 759, a case cited by my colleagues.

Surely S.I.G. acquired far less than the full "bundle" of patent rights since it enjoyed no immunity from infringement judgments, and could not validly dispose of the patents except subject to drastic conditions. In such circumstances, I think a transferee does not become vested with title to a patent, although it receives a formal "assignment" in the same or a separate instrument. See Waterman v. Mackenzie, 138 U.S. 252, 256, 11 S.Ct. 334, 34 L.Ed. 923; Crown Die & Tool Co. v. Nye Tool Machine Works, 261 U.S. 24, 43 S.Ct. 254, 67 L.Ed. 516; Rohmer v. Commissioner, 2 Cir., 153 F.2d 61, 63; Six Wheel Corp. v. Sterling Motor Truck Co., 9 Cir., 50 F.2d 568; Doherty Research Co. v. Vickers Petroleum Co., 10 Cir., 80 F.2d 809.

Nevertheless, I agree that plaintiffs should receive relief. Here it is well to differentiate two kinds of situations: (1) Suppose that, after an alien enemy contracted to sell to an American citizen some ordinary property (wheat or coal, for instance), the Custodian seized that property in the hands of the alien before title passed to the citizen, who had paid the alien a large purchase price. As, ordinarily, no matter what the size of the consideration or the monetary value of the property, the courts will not grant specific performance of such a contract, it may be that the citizen could not obtain specific performance, under this statute, against the Custodian.[5]

---

spect to any revenues received from such licenses for the full term thereof, notwithstanding the same may extend beyond the life of this agreement.

"E. Effective as of the date of termination of this agreement S. I. G. shall reassign to I. G. all patent rights coming within Paragraph D, subject to such licenses as may theretofore have been granted thereunder. As to such licenses, this reassignment shall not affect the obligation of the licensee or the participation of the parties in the royalties to be paid."

It is suggested that paragraph B gives S. I. G., after the termination of the agreement, the right to pass outright title (subject to existing licenses) to any of the patents (other than those within D) for the then unexpired life of such patent. I do not so construe B. Reading it in connection with C, D and E, and in the light of Articles IV-A and V, I think it merely cuts off the right of I. G. to "licensing revenue" accruing after the termination of the agreement. But even if B is construed as suggested, the right thereby conferred is of very narrow scope; for the agreement could not be terminated, at the earliest, until December 1, 1947, by which date the life of many of the patents would have been over or of brief duration.

[4] Except perhaps (as indicated in note 3) the narrow right to transfer outright patents unexpired when the agreement terminated.

[5] As this question was not discussed by the parties and is not here involved, it need not here be answered.

I note in passing that here the $35,-000,000 cannot be said to have been paid solely for title to the Class A patents and the rights under the Class B patents; for Standard received 80% of the royalties and other immensely valuable intangibles.

(2) But I think this statute would authorize specific performance against the Custodian of such a contract with an alien enemy if it related to land or unique chattels, because (a) such a contract would have been specifically enforcible against a transferee with notice and (b) the Custodian, under this statute, must, I think, be regarded as such a transferee. As I agree with my colleagues that the right of S.I.G. to grant licenses to others would have been specifically enforcible against I.G. or a transferee from it with notice, I therefore believe that plaintiffs are entitled to a decree in this suit that that right be thus enforced against the defendant.

That, however, is very different from a ruling that S.I.G. has or should be awarded title to these patents, since, to repeat, such a ruling would confer upon S.I.G. immunity, even if the patents are valid, from judgments in infringement actions, should it make, use or sell the patented products—an immunity which I think the Four Party Agreement carefully precluded.[6]

---

[6] It might conceivably be argued that S. I. G. owns the title but defendant, as successor to I. G., has the right to an injunction against S. I. G., should the latter attempt to violate the conditions imposed by Articles IV-A and V. However, I think that, under the authorities above cited, the facts which would justify such an injunction prevent passage of title: When a court will enjoin the use of a substantial part of the "bundle of rights," it is difficult to deny that the transferor has parted with "substantially less than the entire 'bundle' * * *." Rohmer v. Commissioner, supra. At best, S. I. G., as to a most important part of the "bundle," acquired a bare legal title, which is far less than that which the trial judge allotted to it.